**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MATTHEW CORRIGAN, | |
| Plaintiff, | Civil Action No. 12-173 (BAH) |
| v. | Judge Beryl A. Howell |
| DISTRICT OF COLUMBIA, *et al.* | |
| Defendants. | |

## MEMORANDUM OPINION

The motions for summary judgment filed previously by the defendants, the District of Columbia, Metropolitan Police Department ("MPD") Lieutenant Robert Glover, MPD Sergeant Kevin Pope, and MPD Officer Mark Leone, ECF Nos. 76 (Defendant District of Columbia's Mot. Summ. J.); 79 (Defendant Robert T. Glover's Mot. Summ. J.); and 81 (Defs. Kevin Pope and Mark Leone's Mot. Summ. J.), were denied upon consideration of the grounds put forward by the parties in their moving papers. Minute Orders, Mar. 6, 2015. The parties were advised, however, that pursuant to Federal Rule of Civil Procedure 54(b), the Court is now reconsidering its denial of summary judgment to the aforementioned defendants. Rough Hrg. Tr. ("Hrg. Tr.") 21:8-10;[1] Minute Order, July 22, 2015. After careful reconsideration, including review of the supplemental briefing and exhibits provided by the parties, Defs.' Suppl. Briefing in further Supp. Defs.' Mot. Summ. J. ("Defs.' Suppl. Mem."), ECF No. 119; Pl.'s Resp. Defs.' Suppl. Mem. ("Pl.'s Suppl. Opp'n"), ECF No. 120; Defs.' Reply Pl.'s Suppl. Opp'n Defs.' Suppl. Mem. ("Defs.' Suppl. Reply"), ECF No. 123, for the reasons set out below, the Court concludes that

---

[1] The final transcript of the pretrial conference held on July 24, 2015 is not yet available. Accordingly, the Court cites to the court reporter's unofficial "rough" transcript.

summary judgment as to the individual defendants and the District of Columbia should be granted.

## I.       BACKGROUND

The plaintiff, Matthew Corrigan, is a former resident of the District of Columbia and an Army Reservist.  First Am. Compl. ("FAC") ¶ 2, ECF No. 11.  The plaintiff alleges that, on the night of February 2, 2010, he telephoned the National Suicide Hotline, though he believed he was calling the "Military's Emotional Support Hotline," because "he was depressed and had not slept for several days."  *Id*. ¶¶ 7–9.  During a telephone conversation with a hotline employee, the plaintiff revealed, in response to questioning, that he was a veteran and owned firearms.  *Id*. ¶ 9.  The plaintiff avers that he did not indicate he was suicidal or that he planned to harm anyone. *Id*.  He also contends that he "repeatedly told the person at the National Suicide Hotline that he did not have his guns out."  Pl.'s Statement of Material Facts as to which there are Genuine Issues of Material Dispute ("Pl.'s SMF") ¶ 7, ECF No. 86-1.  "After a short conversation, [the plaintiff] hung up, turned off [his] phone, took prescribed sleeping medication, and went to bed." FAC ¶ 9.

Unbeknownst to the plaintiff, the hotline employee with whom he spoke called 911. Defs.' Suppl. Statement of Material Facts as to which there is no Genuine Dispute in Further Supp. of Defs.' Mot. Summ. J. ("Defs.' Suppl. SMF") ¶ 1, ECF No. 119-1.[2]  MPD officers from the department's Fifth District (or "5D") were sent to the plaintiff's apartment shortly after 11:00 p.m. based on a "report of an 'Attempted Suicide.'"  Def. District of Columbia's Mot. Summ. J.

---

[2] The defendants submitted a supplemental statement of material facts as to which there is no genuine dispute with their supplemental memorandum.  Defs.' Suppl. SMF.  The plaintiff did not separately respond to these supplemental facts.  The Court, therefore, considers the plaintiff to be relying upon his initial Statement of Material Facts as to which there are Genuine Issues of Material Dispute, filed with his omnibus opposition to the defendants' motions for summary judgment, ECF No. 86, as a response to the defendants' supplemental facts.

Ex. 5 ("Barricade Report from 2408 N. Capitol St. NW (5D) on Wednesday, February 3, 2010 (ERT #10-11), Feb. 9, 2010 ("Incident Rep.")) at 1, ECF No. 76-4.  The initial officers on the scene were unable to contact the plaintiff.  Def. District of Columbia's Statement of Material Undisputed Facts ("Def. D.C.'s SMF") ¶ 6, ECF No. 76 ("[M]embers of MPD responded to Plaintiff's apartment and repeatedly tried to reach Plaintiff by phone but were unsuccessful.");  Pl.'s SMF ¶ 8 (noting "the reason for the delay" in reaching the plaintiff "was that Plaintiff was sleeping").  These officers reported "a noted 'strong order' of natural gas emanating from the immediate area in and around the target address," resulting in a call to the local gas utility and the discontinuation of gas service to the building in which the plaintiff's apartment was located and the building next to it.  Incident Rep. at 1.  Based on these facts, "MPD Captain [Mark] Beach declared a barricade" situation at the plaintiff's address, resulting in the members of MPD's Emergency Response Team ("ERT")[3] receiving a "barricade page . . . at approximately 0045 hours" on February 3, 2010.  *Id.* at 1–2; Defs.' Suppl. SMF ¶ 2.

By 2:00 a.m. on February 3, members of the ERT were being briefed by Fifth District officers on the scene, including negotiators who were apparently gathering information from neighbors and other sources.  *See* Incident Rep. at 2.  Lieutenant Glover arrived at the scene around 2:30 a.m., nearly three-and-a-half hours after the initial call to 911 from the suicide hotline employee.  *Id.*; Defs.' Suppl. SMF ¶ 3.

At approximately 4:00 a.m., the plaintiff "awoke because he heard his name being called over a bullhorn."  FAC ¶ 10.  The plaintiff contends that he saw floodlights "outside his front and back doors and an estimated 8 police officers in the back yard and 20 in the front yard."  *Id.*  After turning on his phone, the plaintiff avers that he spoke with "Officer Fisher" of the Fifth

---

[3] The ERT is MPD's equivalent of a special weapons and tactics ("SWAT") team in other jurisdictions.  Glover Dep. 169:20-22.

District, who asked the plaintiff to come out of his home.  *Id.* ¶ 11.  The plaintiff complied at approximately 4:50 a.m. by walking out his front door, which he pulled shut behind him, locking it.  *Id.*

The plaintiff testified at his deposition that as he was being led away from his apartment, an officer stepped out of an ERT vehicle and "asked [the plaintiff] for the key to [his] apartment."  Pl.'s Opp'n Ex. 1 (Depo. of Plaintiff, Nov. 13, 2013 ("Pl.'s Dep.")) 94:11-13, ECF No. 87-1.  The plaintiff told the officer he was "not giving [the officer] consent to go into [his] place."  *Id.* 94:13-14.  In response, the plaintiff recalls the officer saying the officer did not "have time to play this constitutional bullshit.  We're going to break down your door.  You're going to have to pay for a new door."  *Id.* 94:15-18.  The plaintiff states he responded by saying "it looks like I'm paying for a new door, then.  I'm not giving you consent to go into my place."  *Id.* 94:19-21.

Despite the plaintiff's refusal to give consent to the police to search his apartment, Lt. Glover "directed members of the [ERT] to enter and search for any human threats or victims who may have been located inside Plaintiff's apartment."  Def. Glover's Statement of Material Facts as to which there is no Genuine Dispute ("Glover SMF") ¶ 27, ECF No. 79.  Lt. Glover also "ordered the Explosive Ordinance [sic] Division (EOD) to search Plaintiff's apartment" for explosives or other hazardous materials.  *Id.* ¶ 32.  Members of the ERT did not seize any evidence from the apartment, while the EOD unit seized only a "military smoke grenade and military whistler device, which were handled in accordance with standing [national] protocols."  Incident Rep. at 5.[4]

---

[4] The plaintiff disputes whether Lt. Glover ordered the seizure of the plaintiff's property, Pl.'s SMF ¶¶ 90–91, citing testimony of a Crime Scene Search technician, Ofc. Jeffrey Henderson, but this testimony does not support the plaintiff's assertion.  Officer Henderson, who was voluntarily dismissed by the plaintiff as a defendant in this matter, stated in a response to interrogatories that "he was instructed by the 'Command Official on the scene that the items

After leaving his apartment, the plaintiff's hands were restrained with "zip-tie[s]," he was placed in a patrol car, and taken to a Department of Veterans Affairs ("VA") Hospital.  Pl.'s Dep. 91:15-20; 97:21–98:6; *see also* FAC ¶ 11 (stating the plaintiff "was handcuffed and put in the back of a SWAT truck.").  The plaintiff avers that he "admitted himself voluntarily for three days" to the VA Hospital because "[h]aving weapons pointed at him upon leaving his apartment triggered his PTSD hyper-vigilance and caused [an] irregular heartbeat."  FAC ¶ 19.  "On the third day at the VA Hospital, [the plaintiff] was released into police custody, arrested, booked at 5th District, and taken to a local Mental Health Clinic to be reviewed as a suicide risk."  *Id.* ¶ 20.

The plaintiff was charged on February 8, 2010, with "three counts of Possession of an Unregistered Firearm, in violation of D.C. Code § 7-2502.01 and seven counts of Unlawful Possession of Ammunition, in violation of D.C. Code § 7-2506.01."  Pl.'s SMF ¶ 32.  Upon determination that the plaintiff was not a suicide risk, he was held "in the D.C. jail, where he remained until February 19[, 2010], when he was released on his own recognizance to report to Pretrial Services weekly."  FAC ¶ 21.

Upon returning to his apartment, sixteen days after his release, the plaintiff found his "front door unlocked and unsecured."  *Id.* ¶ 22.  The plaintiff alleges that MPD officers "had left the electric stove on, had cut open every zipped bag, had dumped every box and drawer, had

be removed' from Plaintiff's apartment."  Pl.'s SMF ¶ 91.  As the Incident Report makes clear, Lt. Glover was not the Incident Commander, a role that was assigned instead to Captain Mark Beach.  Incident Rep. at 3.  Moreover, at the time Crime Scene Search technicians cataloged and seized items in the plaintiff's apartment, the scene was no longer under the control of the Special Operations Division, of which the ERT and EOD unit are components.  *See* Incident Rep. at 5 ("All other evidence was recovered by Crime Scene Search.  The target location was turned over to the Fifth District and Crime Scene Search at 0730 hours.").  Thus, no colorable dispute of material fact exists that Lt. Glover did not order the seizure of items in the plaintiff's apartment or physically seize any items himself.  Similarly, the plaintiff does not allege that Sgt. Pope, a member of the ERT, or Ofc. Leone, a member of the EOD unit, seized any items.  *See generally* FAC.  Even if the plaintiff's assertion were correct, however, "if police are lawfully in a position from which they view an object, and if the officers have a lawful right of access to the object, they may seize it without a warrant."  *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993) (citing *Horton v. California*, 496 U.S. 128, 136–37 (1990)); *see Kentucky v. King*, 131 S. Ct. 1849, 1858 (2011) (citing *Horton*, 496 U.S. at 136-140 (1990)).

broken locked boxes from under the bed and the closet, and emptied shelves into piles in each room." *Id.* The plaintiff's tropical fish, held in a 150 gallon aquarium, were dead. *Id.* The plaintiff further alleges that MPD officers broke the locked boxes that contained his three firearms and seized them along with numerous rounds of ammunition. *Id.* ¶ 17.

On April 21, 2012, upon the plaintiff's motion in his criminal case, the D.C. Superior Court "determined the police unlawfully searched Plaintiff's home and granted Plaintiff's motion to suppress" the "firearms and ammunition whose possession was at issue in the case on the basis that the police unlawfully seized the evidence by a warrantless search with no exigent circumstances." Pl.'s SMF ¶¶ 33–34. Consequently, "on May 18, 2012, the Superior Court entered a *nolle prosequi* on all [criminal] counts" against the plaintiff. *Id.* ¶ 35.

Before the suppression order and dismissal of the criminal case against the plaintiff, he filed suit in this Court on February 1, 2012, against the District of Columbia and twenty-five unnamed defendants alleging, in a single count, that the defendants violated 42 U.S.C. § 1983 by violating the plaintiff's right to be free from unreasonable searches and seizures under the Fourth Amendment to the United States Constitution while acting under color of state law. *See generally* Compl., ECF No. 1. The plaintiff filed an amended complaint on February 8, 2013, naming the previously unnamed individual defendants. *See* FAC ¶¶ 3–4y.

Over the ensuing two years, the parties engaged in extensive discovery and all but three of the individual defendants and the District of Columbia were dismissed from the suit.[5] The plaintiff voluntarily dismissed sixteen defendant MPD officers, Joint Stipulation of Dismissal of

---

[5] The Court denied the District of Columbia's motion to dismiss, ECF No. 3, at a hearing on the motion held on September 14, 2012, finding that the plaintiff had pleaded adequately, for the purposes of Federal Rule of Civil Procedure 12(b)(6), that a policy or custom of the District of Columbia caused a violation of the plaintiff's Fourth Amendment right to be free from unreasonable searches and seizures. *See Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978).

Seven Defendants at 1, ECF No. 78 (dismissing claims against Defendants Wendell

Cunningham, Joseph Dolan, Thomas Miller, Peter Schumacher, Daryl Thompson, Joseph

Williams, and Charles Yarbaugh); Joint Stipulation of Dismissal at 1, ECF No. 118 (dismissing

Defendants Dorian DeSantis, Jeffrey Henderson, Darrell Isom, William Powell, Joy Preston,

Paul Riggins, Hogan Samels, William Washington, Carlton Wicker, Sr., and William Wright),

and the Court granted Defendants Mark Beach and Burt Henry's motion to dismiss, pursuant to

Federal Rule of Civil Procedure 12(b)(6), Memorandum and Order at 5, ECF No. 69.  In

response to Orders to Show Cause why proof of timely service had not been filed, pursuant to

Federal Rules of Civil Procedure 4(m) and 4(l)(1), as well as Local Civil Rule 5.3, as to

Defendants James Greene and Lawrence Heinz, Order to Show Cause at 1, ECF No. 113; Order

to Show Cause at 1, ECF No. 121, the plaintiff voluntarily dismissed those defendants as well.

Joint Stipulation of Dismissal at 1, ECF No. 115 (dismissing Defendant James Greene); Joint

Stipulation of Dismissal at 1, ECF No. 122 (dismissing Defendant Lawrence Heinz).  Thus, the

remaining defendants are (1) the District of Columbia; (2) Lt. Robert Glover; (3) Sgt. Kevin

Pope; and (4) Ofc. Mark Leone.

Each of the remaining defendants filed motions for summary judgment, ECF Nos. 76

(District of Columbia), 79 (Glover), 81 (Pope & Leone), which motions were denied on March 6,

2015, *see* Minute Orders, Mar. 6, 2015.  In these motions, the parties agreed that the lawfulness

of the searches challenged in this case rested on whether the MPD officers had both probable

cause and exigent circumstances to conduct the searches without a warrant.  *See* Mem. Supp.

Def. Glover's Mot. Summ. J. ("Glover's MSJ Mem.") at 18, ECF No. 79 ("In order to conduct a

search without a warrant, the officer must have both probable cause and exigent

circumstances."); Mem. Supp. Defs. Desantis, Isom, Riggins, Samels, Wicker, Wright, Pope,

Leone, and Powell's Mot. Summ. J. ("Pope & Leone's MSJ Mem.") at 5, ECF No. 81 ("[A]

search without a warrant is legal if the officer if [sic] both probable cause and exigent

circumstances exist for the search."); Pl.'s Opp'n Defs.' Mots. Summ. J. ("Pl.'s MSJ Opp'n") at

1, ECF No. 86 ("[W]ell settled law requires a police officer to have both (1) probable cause to

search, and (2) exigent circumstances that require entering the dwelling to conduct the search

before a judicial warrant can reasonably be secured.").  As this issue was framed by the parties,

the Court concluded that issues of material fact precluded entry of summary judgment, since at

least four material facts pertaining to the existence of probable cause and exigent circumstances

at the time of the challenged searches were identified as disputed in each Order denying

summary judgment.  *See* Minute Orders, Mar. 6, 2015 (citing *Tolan v. Cotton*, 134 S. Ct. 1861,

1865–66 (2014)).  The parties proceeded to prepare and submit motions *in limine*, ECF Nos.

104–06, and a Joint Pretrial Statement, ECF No. 110, in preparation for trial.[6]

In the four month period between the denial of summary judgment and the pretrial

conference, held July 24, 2015, opinions in four cases addressing qualified immunity in section

1983 claims were released, all of which constitute binding authority on this Court, and all of

which resulted in the extension of qualified immunity protection to law enforcement officers.

*See Taylor v. Barkes*, 135 S. Ct. 2042 (issued June 1, 2015); *City and County of San Francisco v.

Sheehan*, 135 S. Ct. 1765 (2015) (issued May 18, 2015); *Fox v. District of Columbia*, No. 14-

7042, 2015 WL 4385290 (D.C. Cir. July 17, 2015); *Lash v. Lemke*, 786 F.3d 1 (D.C. Cir. 2015)

(issued May 15, 2015).[7]  These cases clarified the applicability of qualified immunity in section

---

[6] Although denial of a "summary judgment motion [] based on a claim of qualified immunity" is immediately
appealable as a collateral order, since such denial "is both important and completely separate from the merits of the
action," *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2018–19 (2014), none of the individual defendants appealed the
Court's denial of summary judgment.
[7] A fifth case, *Flythe v. District of Columbia*, 791 F.3d 13 (D.C. Cir. 2015), issued on June 19, 2015, found a
genuine issue of material fact precluded summary judgment on qualified immunity grounds, but the facts in that case
are far removed from the instant matter.  In *Flythe*, the D.C. Circuit held that an officer who shot and killed a

1983 cases such that reconsideration of the denial of the defendant's summary judgment motions is appropriate.

The Court notified the parties that the Court, on its own motion, pursuant to Rule 54(b), was reconsidering the prior denials of the defendants' summary judgment motions, and directed the parties to be prepared to address such reconsideration at the pretrial conference held July 24, 2015.  Minute Order, July 22, 2015.  At the pretrial conference, the parties requested additional time to submit supplemental briefs and exhibits in connection with the Court's reconsideration of the denials of the defendants' motions for summary judgment.  *See* Hrg. Tr. 25:1–26:24.  That request was granted, *id.* 26:4-20, the parties timely made their supplemental submissions, and the Court has carefully considered these filings.  *See* Defs.' Suppl. Mem.; Pl.'s Suppl. Opp'n; Defs.' Suppl. Reply.

## II.    LEGAL STANDARDS

### A.    Reconsideration of Interlocutory Order Under Federal Rule of Civil Procedure 54(b)

Federal Rule of Civil Procedure 54(b) authorizes the reconsideration of "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties" because such an order "does not end the action as to any of the claims or parties" and, thus, "may be revised at any time before the entry of a judgment

---

suspect based on uncorroborated and contradicted assertions that the suspect charged the officer with a knife was not entitled to summary judgment.  Citing the egregious circumstances of the incident in *Flythe*, the D.C. Circuit relied in part on the fact that "every circuit to have confronted [the] question" of qualified immunity "where the police officer killed the only other witness to the incident" had found a need to engage in "a fairly critical assessment of the forensic evidence . . . to decide whether the officer's testimony could reasonably be rejected at a trial."  *Flythe*, 791 F.3d at 19 (quoting *Plakas v. Drinski*, 19 F.3d 1143, 1147 (7th Cir. 1994)).  The D.C. Circuit found multiple contradictory witness reports, as well as evidence that the officer who fired the fatal shots tested positive for amphetamines just "four days after the killing" and that the MPD "fired him after concluding that he lied about using illegal methamphetamines," sufficient to raise material factual disputes about the reliability of the officer's testimony such that the case should proceed to a jury.  *Id.* at 21.  Given the unique factual scenario in *Flythe*, the D.C. Circuit's holding in that case is of limited relevance to the instant matter.

adjudicating all the claims and all the parties' rights and liabilities." FED. R. CIV. P. 54(b).  A

summary judgment motion that "ensure[s] that litigation will continue in the District Court" is

properly considered an interlocutory order since it is not a "final decision" of the Court.  *United

States v. Rose*, 28 F.3d 181, 185 (D.C. Cir. 1994); *see also* 3 William W. Schwarzer et al.,

FEDERAL CIVIL PROCEDURE BEFORE TRIAL § 14:367 (2013)("Denial of a summary judgment

motion is an interlocutory order" and "[d]istrict courts have discretion to entertain successive

summary judgment motions on the same (or different) grounds.").

> Consequently, a court may reconsider, *sua sponte*, its prior interlocutory order denying

summary judgment to a party, so long as such reconsideration meets the standard set forth in

Rule 54(b).  That standard is a lenient one that "differs from the standards applied to final

judgments under Federal Rules of Civil Procedure 59(e) and 60(b)."  *Rogers v. Mabus*, 699 F.

Supp. 2d 73, 76 (D.D.C. 2010) (quoting *Williams v. Savage*, 569 F. Supp. 2d 99, 108 (D.D.C.

2008)).  Rule 54(b) "recognizes [the district court's] inherent power to reconsider an

interlocutory order 'as justice requires.'"  *Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.*,

630 F.3d 217, 227 (D.C. Cir. 2011) (quoting *Greene v. Union Mut. Life Ins. Co. of Am.*, 764 F.2d

19, 22-23 (1st Cir. 1985) (Breyer, J.); *Childers v. Slater*, 197 F.R.D. 185, 190 (D.D.C. 2000)

(quoting FED. R. CIV. P. 60(b) Advisory Comm. Notes).  "'As justice requires' indicates concrete

considerations of whether the court 'has patently misunderstood a party, has made a decision

outside the adversarial issues presented to the [c]ourt by the parties, has made an error not of

reasoning, but of apprehension, or where a controlling or significant change in the law or facts

[has occurred] since the submission of the issue to the Court."  *Judicial Watch v. Dep't of Army*,

466 F. Supp. 2d 112, 123 (D.D.C. 2006) (quoting *Cobell v. Norton*, 224 F.R.D. 266, 272 (D.D.C.

2004)); *see also Act Now to Stop War & End Racism Coalition v. District of Columbia* (*Act Now*)*,* 286 F.R.D. 117, 125 (D.D.C. 2012).

### B.      Summary Judgment Under Federal Rule of Civil Procedure 56

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  Summary judgment is properly granted against a party who, "after adequate time for discovery and upon motion, . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The burden is on the moving party to demonstrate that an "absence of a genuine issue of material fact" in dispute. *Id.* at 323.

In ruling on a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014) (quoting *Anderson v. Liberty Lobby, Inc.* ("*Liberty Lobby*"), 477 U.S. 242, 255 (1986)) (alteration in original).  Specifically, "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Id.* at 1866 (citing *Brosseau v. Haugen*, 543 U.S. 194, 195 n.2 (2004)).  For a factual dispute to be "genuine," the nonmoving party must establish more than "[t]he mere existence of a scintilla of evidence in support of [its] position," *Liberty Lobby*, 477 U.S. at 252.  "When, opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Lash*, 786 F.3d at 6 (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).  While the Court is only required to consider the materials explicitly cited by the parties, it may on its own accord consider "other materials in the record." FED. R. CIV. P. 56(c)(3).

The nonmoving party must present specific facts that would enable a reasonable jury to find in his favor. *See, e.g.*, FED. R. CIV. P. 56(c)(1); *Equal Rights Ctr. v. Post Props.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011) (noting that at summary judgment stage, plaintiff "can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' . . . which for purposes of the summary judgment motion will be taken to be true.'" (quoting *Sierra Club v. EPA*, 292 F.3d 895, 898–99  (D.C. Cir. 2002)) (ellipsis and alterations in original)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50 (citations omitted). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. In that situation, "[t]he moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id*.

### C.    Qualified Immunity

In suits brought under 42 U.S.C. § 1983, "[p]ublic officials are immune from suit . . . unless they have 'violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.'" *Sheehan*, 135 S. Ct. at 1774 (quoting *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014)). The doctrine "exists to protect officers 'from undue interference with their duties and from potentially disabling threats of liability.'" *Lash*, 786 F.3d at 5 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982)). "Qualified immunity 'gives government officials breathing room to make reasonable but mistaken judgments' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1244 (2012) (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011)). Consequently, whether qualified immunity applies "'generally turns on the objective legal

reasonableness of the [official's] action, assessed in light of the legal rules that were clearly established at the time.'" *Id.* at 1245 (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)).

The Supreme Court in *Saucier v. Katz*, 533 U.S. 194, 201 (2001), mandated a two-step protocol for evaluating a government officials' qualified immunity defense to a § 1983 claim. First, the court must determine whether the plaintiff has "alleged facts showing a violation of a constitutional right," and, second, the court must decide "whether the constitutional right was clearly established at the time of the incident." *Fox*, 2015 WL 4385290, at *2 (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). The test is flexible in that a court may address either of the two steps first. *Pearson*, 555 U.S. at 242; *Fox*, 2015 WL 4385290, at *3 (same).

A right is "clearly established" if it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Taylor*, 135 S. Ct. at 2044 (quoting *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012)). "'Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or [] Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.'" *Doe v. District of Columbia*, No. 13-7140, 2015 WL 4727142, at *6 (D.C. Cir. Aug. 11, 2015) (quoting *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001)). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 131 S. Ct. at 2083.

## III.   DISCUSSION

Throughout much of this litigation, the plaintiff and the defendants have predicated their arguments on the same erroneous premise: that all warrantless searches conducted by police must be justified by probable cause combined with exigent circumstances. Pl.'s Suppl. Opp'n at

15; Glover's MSJ Mem. at 18.[8]  While "it is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable," *Groh v. Ramirez*, 540 U.S. 551, 559 (2004), the Supreme Court has set out  "narrow and well-delineated exceptions to the warrant requirement," *Flippo v. West Virginia*, 528 U.S. 11, 13 (1999) (per curiam), that do not require probable cause.  In applying an erroneous standard, the parties obscured the true question at issue in this matter: whether the defendants' actions in searching for injured persons and explosives were reasonable in light of the defendants' duty to protect the public-at-large, rather than in connection with any criminal investigative function.  Thus, the following analysis proceeds in three parts.  First, the doctrines of community caretaking, exigent circumstances, and emergency aid, which are subsets of police searches exempt from the Fourth Amendment's warrant and probable cause requirements are described in detail.  Second, the individual defendants' qualified immunity defense is evaluated in light of these overlapping doctrines.  Finally, the case against the municipal defendant is reviewed.

### A.    Exemptions From The Fourth Amendment Warrant And Probable Cause Requirements

The parties are correct that, when engaging in a law enforcement function, police officers must either have a warrant or probable cause plus exigent circumstances justifying a warrantless search.  *See, e.g.*, *City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2452 (2015) ("[T]he Court has repeatedly held that 'searches conducted outside the judicial process, without prior approval by [a] judge or [a] magistrate [judge], are *per se* unreasonable." (all but first alteration in original)); *In re Sealed Case*, 153 F.3d 759, 764 (D.C. Cir. 1998) ("'a search or seizure carried out on a

---

[8] In their supplemental reply filed on August 13, 2015, the defendants assert, for the first time, that "probable cause and exigent circumstances are not *both* necessary to justify warrantless entry into a home" when "there is basis to believe there is an immediate need to protect the lives or safety of themselves or others."  Defs.' Suppl. Reply at 2 (emphasis in original).

suspect's premises without a warrant is per se unreasonable, unless the police can show . . . the presence of 'exigent circumstances.'" (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 474–75 (1971)) (alteration in original)).  The plaintiff argues that this familiar standard is absolute, without exception.  Pl.'s Suppl. Opp'n at 15 (citing *Kirk v. Louisiana*, 536 U.S.C. 635, 638 (2002); *Katz v. United States*, 389 U.S. 347, 357 (1967); *United States v. Dawkins*, 17 F.3d 399, 403 (D.C. Cir. 1994); and *United States v. Socey*, 846 F.2d 1439, 1444 n.5 (D.C. Cir. 1988)).  To the contrary, the Supreme Court has made clear that the context in which a search takes place is determinative of whether a warrant or probable cause is necessary for a search or seizure to comport with the Fourth Amendment.

The Supreme Court's decision in *City of Los Angeles v. Patel* illustrates this point.  *Patel* involved a Fourth Amendment challenge to a statute requiring hotel operators to provide guests' identification records at any time upon a request from police. 135 S. Ct. at 2452.  The Supreme Court struck down the statute at issue, since it allowed for no precompliance review, but explained that not all such statutes must be rejected.  "Search regimes where no warrant is ever required may be reasonable where 'special needs . . . make the warrant and probable-cause requirement impracticable.'"  *Id.* at 2451–52 (quoting *Skinner v. Railway Labor Executives Ass'n*, 489 U.S. 602 (1989)) (alterations in original).  Fourth Amendment exceptions that fall into this "special needs" category include the "administrative search" exception, which was unsuccessfully invoked in *Patel*, and, of particular relevance to the instant matter, the "exigent circumstances" exception.  *See id.*

As the Seventh Circuit recently pointed out, the law "recognizes that police sometimes take actions not for any criminal law enforcement purposes but rather to protect members of the public."  *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 553 (7th Cir. 2014).  The factual

15

scenario in *Sutterfield* case bears many similarities to the instant matter.  In *Sutterfield*, police

officers entered the home of a woman, who had told her psychiatrist she planned to commit

suicide while wearing an empty holster, despite the woman telling the police that "she was fine

and that she did not want anyone to enter her residence."  *Id.* at 547.  The police officers

subsequently effected a forced entry into the plaintiff's home and handcuffed her pursuant to a

state statute that allows for involuntary assessment of individuals experiencing mental health

issues under certain circumstances.  *See id.* at 545–47.  While "conduct[ing] a protective sweep

of the home," officers forced open a locked "compact disc carrying case," discovering "a semi-

automatic handgun inside."  *Id.* at 547.  The officers seized the gun and took the plaintiff to a

psychiatric hospital for evaluation.  *Id.*

The Seventh Circuit found the officers were entitled to qualified immunity because, *inter*

*alia*, the police were not acting in a law enforcement capacity and their actions were reasonable

in context.  *See id.* at 576.  In such circumstances, the *Sutterfield* court noted, when officers are

acting as so-called "community caretakers," any "searches (including home entries) . . . are

deemed exempt from the Fourth Amendment warrant requirement."  *Id.* at 553–54.  The

*Sutterfield* court, in a thorough and scholarly opinion, identified three distinct subsets of these

exempt searches, namely, "the community caretaking doctrine, the emergency aid doctrine, and

the exigent circumstances doctrine."  *Id.* at 553.  Each is described below.

### 1.    *The Community Caretaking Doctrine*

The "community caretaking" doctrine was first recognized by the Supreme Court in *Cady*

*v. Dombrowski*, 413 U.S. 433 (1973).  *Sutterfield*, 751 F.3d at 554.  In *Cady*, the Supreme Court

held that a vehicular search to locate the service revolver of an off-duty police officer, after he

wrecked his car in a drunk driving incident, was reasonable because such a search was motivated

by "concern for the safety of the general public who might be endangered if an intruder" into the

unguarded storage area where the car was being kept "removed a revolver from the trunk of the vehicle." *Cady*, 413 U.S. at 447. Indeed, the *Cady* Court noted that "[l]ocal police officers . . . frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.* at 441. In *Cady*, the search for the officer's revolver led police to unlock the car's trunk, where bloody clothes and other evidence of a murder were discovered. *Id.* at 437. Bolstering the reasonableness of the search in *Cady* were the Supreme Court's findings that the officers who searched the plaintiff's car were following standard police procedure and were "ignorant of the fact that a murder, or any other crime, had been committed." *Id.* at 447.

The holding in *Cady* has evolved into the line of cases supporting so-called "inventory searches" of seized automobiles, *Sutterfield*, 751 F.3d at 555, but the Supreme Court's nomenclature of "community caretaking" continues to be used by many courts, including the District of Columbia Court of Appeals, to describe this doctrinal exception to the Fourth Amendment warrant and probable cause requirements. In *Hawkins v. United States*, 113 A.3d 216, 221–22 (D.C. 2015), a case involving a vehicular search, the D.C. Court of Appeals recently adopted a four part test to determine whether a "law enforcement officer's community caretaking conduct [is] reasonable." *Id.* First, the defendant asserting the community caretaking exception must show "by specific and articulable facts that the government's conduct was totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.* at 222. Thus, the community caretaker doctrine does not require an officer to have "probable cause" to believe a crime is being or has been committed, which is a prerequisite for a

standard criminal warrant. *Id.* Second, the defendant must prove that "the government's conduct was reasonable considering the availability, feasibility, and effectiveness of alternatives to the officer's action." *Id.* Third, the defendant must show that "the officer's action ended when the citizen or community was no longer in need of assistance." *Id.* Finally, the defendant must show that "the government's interests outweigh the citizen's interest in being free from minor government interference." *Id.* Moreover, District of Columbia law "does not require the government to pursue the least restrictive means of correcting the problem" that gave rise to the officer's action. *Id.*[9]

The community caretaking doctrine can be difficult to define. *Sutterfield*, 751 F.3d at 555–56; *Hawkins*, 113 A.3d at 221; *Pleasant-Bey v. United States*, 988 A.2d 496, 502 (D.C. 2010). In *Sutterfield*, the court surveyed federal case law regarding the exception and noted that the Seventh, "Third, Ninth, and Tenth circuits have confined the community caretaking exception to the automobile context," while "the Fifth, Sixth, and Eighth circuits have relied on the community caretaking exception to justify warrantless searches of the home." 751 F.3d at 556 (collecting cases). The First, Fourth, and Eleventh Circuits have declined to rule explicitly

---

[9] In 2010, when the events at issue in this matter took place, the D.C. Court of Appeals was reluctant to apply the community caretaking doctrine since "'[w]hat community caretaking involves and what boundaries upon it exist have simply not been explained to an extent' that would permit [the Court] to comfortably apply that doctrine." *Pleasant-Bey v. United States*, 988 A.2d 496, 502 (D.C. 2010) (quoting *Hunsberger v. Wood*, 570 F.3d 546, 554 (4th Cir. 2009)). Nevertheless, the community caretaking doctrine itself has existed since *Cady* was decided in 1973, and the D.C. Circuit recognized its potential application to police searches of automobiles in 2003 in *United States v. Maple*, 348 F.3d 260, 263 (D.C. Cir. 2003). The *Maple* court cited *Cady* for the proposition that police "engage in what . . . may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.* (quoting *Cady*, 413 U.S. at 441). Thus, although the four-part test set out in *Hawkins* could not have been known by the defendants in the instant matter in 2010, the existence and potential application of the community caretaking exception is reasonable to consider for qualified immunity purposes. *See Youngbey v. March*, 676 F.3d 1114, 1117 (D.C. Cir. 2012) ("[T]he protection of qualified immunity is available if 'a reasonable officer could have believed that [his or her actions were] lawful, in light of clearly established law and the information the officers possessed.'") (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999)).

on whether the doctrine extends to searches of the home.  *Id.*  Similarly, state courts have differed in their application of the doctrine.  *Hawkins*, 113 A.3d at 221.

In the face of widespread differences among courts at both the state and federal levels in the application of the community caretaking doctrine to situations not involving automobiles, the D.C. Court of Appeals has not expressly opined whether the test articulated in *Hawkins* applies solely to automobiles or more broadly.  Arguably, the *Hawkins* court implicitly recognized an expanded scope of the doctrine by citing *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006), for the contention that searches pursuant to the community caretaking doctrine "should be evaluated as a Fourth Amendment search."  *Hawkins*, 113 A.3d at 222; *id*. at 221–22 ("The facts of the instant case lead us to further adopt a hybrid of the reasonableness and balancing tests, in light of the totality of the circumstances, to assess whether an officer's community caretaking conduct comports with the Fourth Amendment.").  In another community caretaking decision issued six months before *Hawkins*, the D.C. Court of Appeals similarly hinted that the doctrine may apply beyond automobile cases.  *Davis v. United States*, 110 A.3d 590, 595 n.9 (D.C. 2015) ("[T]his court has recognized that the community caretaking function may apply outside that context, at least in 'exceptional circumstances.'" (quoting *United States v. Gaskin*, 368 A.2d 1138, 1139 (D.C. 1977)).

Although the *Hawkins* decision sets forth the District of Columbia's view of the community caretaking doctrine, this Court is not bound by that decision in determining whether the search in the instant matter actually violated the Fourth Amendment, regardless of whether it meets the *Hawkins* test.  *See Sutterfield*, 751 F.3d at 557 (noting that where state court interpretation of community caretaking doctrine conflicted with Circuit doctrine, Circuit doctrine controlled).  Yet, local court interpretations of the contours of the community caretaking doctrine

are clearly relevant in evaluating whether police officers are entitled to qualified immunity for a search that the plaintiff claims violates the Fourth Amendment.

### 2.    *The Exigent Circumstances Doctrine*

The Supreme Court expressly identified and articulated the exigent circumstances exception to the Fourth Amendment's warrant requirement, ironically, in a case that eliminated another such exception.  In *Mincey v. Arizona*, 437 U.S. 385, 388 (1978), the Supreme Court reversed a state court judgment that "the warrantless search of a homicide scene is permissible under the Fourth and Fourteenth Amendments."  The so-called "murder scene exception" allowed law enforcement officers, who "were legally on the premises in the first instance," to execute "a reasonable, warrantless search of the scene of a homicide—or of a serious personal injury with likelihood of death where there is reason to suspect foul play," without violating the Fourth Amendment.  *Id.* at 389–90.

The *Mincey* Court rejected the exception, holding that "the generic exception delineated by the Arizona Supreme Court" was invalid under the Fourth Amendment.  *Id.* at 390.  In doing so, however, the *Mincey* Court noted that it did "not question the right of police to respond to emergency situations" and "the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid."  *Id.* at 392.  In holding that "warrants are generally required to search a person's home or his person unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment," *id.* at 393–94, the Supreme Court cited various instances where searches were found to be reasonable that, absent the exigencies, would have amounted to constitutional violations.  *See id.* Among the examples given by the Supreme Court were circumstances that either required probable cause that a crime was being committed or the presence of probable cause was implied

as part of the exception, including "hot pursuit" of a criminal suspect, *id*. at 394 (citing *Warden v. Hayden*, 387 U.S. 294, 298–300 (1967) (finding warrantless search conducted in "hot pursuit" of suspect reasonable)); a search incident to arrest, *id*. (citing *Chimel v. California*, 395 U.S. 752, 765–66 (1969) (finding search to secure the person of, and immediate area around, a detained suspect reasonable)); and preservation of evidence, *id*. (citing *Schmerber v. California*, 384 U.S. 757, 770–71 (1966) (finding search to prevent the imminent destruction of evidence reasonable)). These examples provide the precedent for the legal principle relied upon by the plaintiff in the instant matter that warrantless searches require both probable cause and exigent circumstances to be lawful under the Fourth Amendment.

Yet, the *Mincey* Court explicitly recognized another type of search where probable cause was *not* required. The Court cited *Michigan v. Tyler*, 436 U.S. 499, 509–10 (1978), in which the Court held that "officials need no warrant to remain in a building for a reasonable time to investigate the cause of a blaze after it has been extinguished," since "it would defy reason to suppose that firemen must secure a warrant or consent before entering a burning structure to put out the blaze." The *Tyler* Court also noted that "once in a building for this purpose" of extinguishing a fire, "firefighters may seize arson evidence that is in plain view." *Id*. at 509. The *Tyler* rationale differed significantly from that of *Hayden*, *Schmerber*, and *Chimel*. In the latter, probable cause to believe a crime had taken place was necessary to justify what would otherwise be an unreasonable search. In the former, however, the Court held that firefighters, acting to mitigate "an exigency of sufficient proportions to render a warrantless entry 'reasonable,'" needed no probable cause that a crime had occurred, or that evidence of contraband would be found, to either enter the building or remain in the building for a reasonable period of time to determine the cause of the blaze. *Id*. at 509–10. Thus, the "exigent

circumstances" doctrine may cover both types of circumstances where probable cause is required to exist and where it is not.

The D.C. Circuit expressly recognized the exigent circumstances doctrine, divorced from the probable cause requirement, as early as 1979 in *United States v. Hendrix*, 595 F.2d 883, 885–86 (1979).  There, the Circuit upheld the warrantless entry by police officers into an apartment when consent was provided by an alleged domestic violence victim, who lived in the apartment with her alleged abuser.  The *Hendrix* Court found that, even had the victim's consent not been given to search the apartment, exigent circumstances justified the search since the presence of a firearm in the home constituted a "threat to human life."  *Id.* at 886.  Moreover, the D.C. Circuit noted that, in the circumstances at issue in *Hendrix*, a delay of several hours to obtain a warrant was unacceptably long, since the suspect, who had been detained prior to the search, was ultimately arrested only for disorderly conduct.  *Id.*  The Court found the likelihood that the suspect could obtain his release and return to his home where the firearm was stored before the police could obtain a warrant was another sufficient reason to justify a warrantless search of the premises.  *Id.*  A Supreme Court case nearly thirty years later, *Georgia v. Randolph*, 547 U.S. 103, 120 (2006), found that consent of one co-occupant in the face of a lack of consent from the other was insufficient to allow a warrantless search, thus abrogating one of the D.C. Circuit's grounds for decision in *Hendrix*.  Nevertheless, the *Randolph* Court noted that the ultimate result in *Hendrix* would have been no different, since the D.C. Circuit properly found exigent circumstances supported the warrantless entry.  *Id.* at 119.  Thus, for purposes of the instant matter, application of the exigent circumstances doctrine where no probable cause is required, as approved in *Hendrix,* remains good law.

While it is true that "courts have not spelled out a definition of 'exigency' with any precision," *United States v. Dawkins*, 17 F.3d 399, 405 (D.C. Cir. 1994), one clearly established exigency is "'[t]he need to protect or preserve life or avoid serious injury,'" *United States v. Goree*, 365 F.3d 1086, 1089 (D.C. Cir. 2004) (quoting *Mincey*, 437 U.S. at 392) (alteration in original). Determining the reasonableness of a warrantless search under such circumstances is "'judged according to the totality of the circumstances,' and the standard 'is an objective one, focusing on what a reasonable, experienced police officer would believe.'" *Goree*, 365 F.3d at 1090 (quoting *In re Sealed Case*, 153 F.3d at 766). A warrantless search under exigent circumstances is not without restrictions. The Supreme Court and the D.C. Circuit have made clear that such searches may be "no broader than necessary," *United States v. Mason*, 966 F.2d 1488, 1492 (D.C. Cir. 1992), and "must be strictly circumscribed by the exigencies which justify its initiation," *Goree*, 365 F.3d at 1090 (quoting *Mincey*, 437 U.S. at 393) (internal quotation marks omitted).

### 3.     *The Emergency Aid Doctrine*

The third exception to the Fourth Amendment's warrant requirement discussed in *Sutterfield* and relevant to the instant matter is the "emergency aid doctrine, which recognizes that a warrantless entry into the home may be appropriate when police enter for an urgent purpose other than to arrest a suspect or to look for evidence of a crime." *Sutterfield*, 751 F.3d at 557. The Seventh Circuit opined that this exception has come to be viewed as a "subset" of the exigent circumstances doctrine in the wake of the Supreme Court's decision in *Brigham City v. Stuart*, 547 U.S. 398 (2006). *See Sutterfield*, 751 F.3d at 558.

In *Brigham City*, the specific question at issue was "whether police may enter a home without a warrant when they have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury." *Brigham City*, 547 U.S. at 400.

23

In that case, police officers were investigating a noise complaint at a house and observed "through a screen door and windows-an altercation taking place in the kitchen of the home." *Id.* at 401. After seeing a juvenile break free of the people trying to restrain him and punch an adult in the face, the officers entered the kitchen by opening a screen door, identified themselves, and remained until the altercation had ceased. *Id.* The Supreme Court held that "in these circumstances, the officers had an objectively reasonable basis for believing both that the injured adult might need help and that the violence in the kitchen was just beginning." *Id.* at 406.

*Brigham City* reinforced two important aspects of the emergency aid doctrine. First, the Supreme Court noted that while the state court "considered the officers' subjective motivations relevant," in determining whether the emergency aid doctrine applied, the Supreme Court's "cases have repeatedly rejected this approach. *Id.* at 404. An action is 'reasonable' under the Fourth Amendment regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify [the] action.'" *Id.* (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978)) (emphasis in original); *see id.* at 402 (quoting *In re Sealed Case*, 153 F.3d at 766, for proposition that "the standard for exigent circumstances is an objective one.").

Second, *Brigham City* affirmed the principle that police officers may act prophylactically to protect citizens from potential as well as actual violence. *Id.* at 406. Rather than requiring officers in *Brigham City* to "wait until another blow rendered someone 'unconscious' or 'semi-conscious' or worse before entering," the Supreme Court noted that "[t]he role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties." *Id.* The Supreme Court's holding in *Brigham City* echoes comments the Court had made two months prior to the *Brigham City* opinion in *Randolph*, where the Court noted a fundamental difference between when police may enter a dwelling to search for evidence as opposed to entering

"without committing a trespass."  547 U.S. at 118.  The *Randolph* Court opined that an officer

was entirely justified in entering "a dwelling to protect a resident from domestic violence . . . or

to determine whether violence (or threat of violence) has just occurred or is about to occur,

however much a spouse or other co-tenant objected."  *Id.*  Most importantly for the instant

matter, the *Randolph* Court telegraphed the holding announced two months later in *Brigham

City*, when it recognized "[t]he undoubted right of the police to enter [a residence] in order to

protect a victim."  *Id.* at 118–19; *accord Hawkins v. United States*, 113 A.3d at 220.

*     *     *

In sum, at least three exceptions to the Fourth Amendment's warrant and probable cause

requirement exist: when officers are acting as community caretakers; when officers are

responding to exigent circumstances; and when officers are endeavoring to provide emergency

aid.  The parties' dispute over whether the individual defendants had "probable cause" in the

sense of whether the defendants had a reason to believe evidence of a crime was present in the

plaintiff's apartment to warrant a search is simply inapposite to the matters at issue.  As a result,

many, if not all, of the disputed issues of material facts identified by the parties and relied upon

by the Court in its initial ruling on the defendants' motions for summary judgment, *see* Minute

Orders, March 6, 2015, are immaterial to determining whether a Fourth Amendment violation

occurred and whether the individual defendants are entitled to qualified immunity for their

actions.  An examination of the individual defendants' actions in the context of the community

caretaking doctrine, the exigent circumstances doctrine and the emergency aid doctrine, each of

which provides an exception to the Fourth Amendment's warrant and probable cause

requirements, follows.

**B.    The Individual Defendants Are Entitled To Qualified Immunity**

Three individual defendants remain in the instant suit: MPD Lt. Glover, who commanded the Emergency Response Team ("ERT") and Explosive Ordnance Disposal ("EOD") Unit; MPD Sgt. Kevin Pope, the sergeant whose team made the initial entry into the plaintiff's apartment; and MPD Ofc. Mark Leone, the bomb technician who swept the apartment for explosives and hazardous materials.  *See supra* Part I.  Lieutenant Glover ordered both the ERT, which included Sgt. Pope, and the EOD unit, which included Ofc. Leone, to search the plaintiff's apartment.  *See* Glover SMF ¶¶ 27, 32; Pl.'s SMF ¶¶ 58, 69.  If the searches ordered by Lt. Glover did not violate any clearly-established right under the Fourth Amendment, all three individual defendants are entitled to qualified immunity under the second prong of the *Saucier* test.  Thus, the central question to be decided is whether Lt. Glover's actions were reasonable under clearly established law.

The plaintiff argues that Lt. Glover's actions were unreasonable because he lacked probable cause to enter the plaintiff's apartment and any exigent circumstances were extinguished when the plaintiff left his apartment.  *See* Pl.'s Suppl. Opp'n at 5–11.[10]  The first argument is a red herring, as explained previously, since no probable cause was necessary to conduct the searches in question, given that the officers involved were not acting in a law

---

[10] At the hearing held July 24, 2015, the plaintiff was asked to define the contours of the right the plaintiff claims was violated, beyond the general "the police are not allowed to effect a warrantless entry into a person's home without probable cause."  Hrg. Tr. 29:12-14.  In his opposition, the plaintiff did not attempt to delineate the allegedly violated right more clearly, as requested by the Court.  *See generally* Pl.'s Suppl. Opp'n.  Rather, the plaintiff cites *Kirk*, 536 U.S. at 638, *Katz*, 389 U.S. at 357, *Dawkins*, 17 F.3d at 403, *Socey*, 846 F.2d at 1444 n.5, and *United States v. Timberlake*, 896 F.2d 592, 597–98 (D.C. Cir. 1990), for the proposition that police require both exigent circumstances and probable cause to conduct a warrantless search of a home.  Pl.'s Suppl. Opp'n at 14–15.  This response is inadequate for two reasons.  First, defining the right as one to be free from a warrantless search unless probable cause and exigent are present, is to define the right at the "high level of generality" the Supreme Court rejected in *Sheehan*.  *See Sheehan*, 135 S. Ct. at 1776 (quoting *al-Kidd*, 131 S. Ct. at 2084).  Second, the plaintiff's proposition, as discussed *supra*, in Part III.A, is incorrect as a matter of law: probable cause is not always required for a warrantless search.  Thus, the cases cited by the plaintiff, which stand merely for the general proposition that warrantless entries into homes are presumptively unreasonable, are of little value to deciding the instant matter.

enforcement capacity but in their capacity as protectors of public safety.  *See, e.g.*, *Hawkins*, 113 A.3d at 220.  As for the second argument, the plaintiff does not challenge the existence of the facts that Lt. Glover cites as the reason he ordered the ERT and EOD Unit searches, but rather challenges the legal significance of those facts, namely, whether a reasonable officer possessing the knowledge Lt. Glover had at the time would have ordered the searches.  *See* Pl.'s Suppl. Opp'n at 5–11.  Given the lack of any factual dispute over what Lt. Glover says he knew, which is corroborated by other evidence in the record, the objective reasonableness of his actions is a question of law appropriate for the Court to determine.

The D.C. Circuit has admonished that, in § 1983 cases such as this one, "[d]etermining that a constitutional right exists and has been abridged by official conduct is not only difficult at times, but asks much of a court that should resolve matters on constitutional grounds only when there is no other way to do so."  *Lash*, 786 F.3d at 5 (citing *Pearson*, 555 U.S. at 241).  Of course, consistently failing to decide constitutional questions in favor of recognizing merely a lack of clarity as to the appropriate answer was the precise result the Supreme Court sought to prevent in originally requiring rigid adherence to the framework of deciding whether a constitutional right was violated *before* deciding whether the right was clearly established at the time.  *See Saucier v. Katz*, 533 U.S. at 201 ("In the course of determining whether a constitutional right was violated on the premises alleged, a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established.  This is the process for the law's elaboration from case to case, and it is one reason for our insisting upon turning to the existence or nonexistence of a constitutional right as the first inquiry."), *receded from by Pearson*, 555 U.S. at 241.  As discussed next, the individual defendants are

entitled to qualified immunity under both prongs of the *Saucier* test, a conclusion that also

resolves the liability of the municipal defendant.

> **1.    *Second Saucier Prong: The Individual Defendants Violated No Clearly-Established Fourth Amendment Right***

Perhaps the clearest principle to be drawn from the foregoing discussion of the

community caretaking, exigent circumstances, and emergency aid doctrines is that these

doctrines are often ill-defined, overlapping, and difficult to distinguish from one another. *See*

*Sutterfield*, 751 F.3d at 579 (finding, despite "uncertainty as to which legal framework best

applies to the warrantless actions of the police in these circumstances, the police could have

believed that [state] precedents, if not the federal cases, authorized them to take these actions in

order to protect [the plaintiff's] well-being as well as the well-being of anyone else . . . who

might have access to [the plaintiff's] home in her absence"). Indeed, as previously noted, even

the parties' lawyers in this action seem to have misunderstood the applicable principles in the

first round of summary judgment briefing, necessitating this reconsideration. The parties

reliance in their initial summary judgment briefing on an incorrect standard is perhaps due to

what the Seventh Circuit recognized as a "persist[ent] [] lack of clarity in Fourth Amendment

case law as to the appropriate legal framework that should be applied to warrantless intrusions

motivated by purposes other than law enforcement and evidence-gathering." *Id.* at 551–52

(finding "tentative nature of some of [the court's] analysis appropriate" in light of, *inter alia*,

"the lack of clarity in the case law, and the shallowness of the briefing" before it); *id.* at 553 n.5

(noting that "[s]cholars have frequently remarked on the lack of clarity in judicial articulation

and application of the three doctrines" providing exceptions to the warrant requirement); *id.* at

553 (noting "some degree of overlap between the doctrines" of community caretaking,

emergency aid and exigent circumstances, and that "the distinctions between them are not always clear").

Considering this gray area of the law, coupled with the tension inherent in a barricade situation in the middle of a freezing, winter night, this Court must carefully heed the Supreme Court and D.C. Circuit's frequent refrain that the appropriate "question [for qualified immunity purposes] is whether, in light of precedent existing at the time, [an officer] was 'plainly incompetent'" in taking the challenged action.  *Stanton v. Sims*, 134 S. Ct. 3, 5 (2013). The Supreme Court's discussion in *Stanton* of the state of the law regarding whether a police officer's warrantless entry into a home while in hot pursuit of a misdemeanant is remarkably similar to the state of the law regarding the aforementioned doctrinal exceptions to the warrant and probable cause requirements: "To summarize the law at the time . . . [t]wo opinions of [the Supreme] Court were equivocal on the lawfulness of [the] entry; two opinions of the State Court of Appeal affirmatively authorized that entry; the most relevant opinion of the Ninth Circuit was readily distinguishable; two Federal District Courts in the Ninth Circuit had granted qualified immunity in the wake of that opinion; and the federal and state courts of last resort around the nation were sharply divided." *Id.* at 7.  In such circumstances, the Supreme Court held, the officer "may have been mistaken in believing his actions were justified, but he was not 'plainly incompetent.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

In the instant matter, where the circuits are divided on whether the community caretaking exception applies to warrantless entries into the home, *see Sutterfield*, 751 F.3d at 556; the D.C. Circuit in an analogous factual scenario found the officer's warrantless entry into a home to be justified, *Hendrix*, 595 F.2d at 886; and other Supreme Court and federal appellate court opinions indicating the officers' actions would likely be justified, *see Brigham City*, 547 U.S. at

406; *Mora v. City of Gaithersburg*, 519 F.3d 216 (4th Cir. 2008), it cannot be said that Lt. Glover

was "plainly incompetent" for issuing his orders, or that Sgt. Pope and Ofc. Leone were "plainly

incompetent" for following them.  Thus, at the very least, the plaintiff cannot show that the

individual defendants violated a "right [that] was clearly established."  *Pearson*, 555 U.S. at 232.

Thus, these individual MPD officer defendants are entitled to qualified immunity and grant of

summary judgment in their favor.

### 2.  *First Saucier Prong: Individual Defendants' Actions Did Not Violate Fourth Amendment Rights of Plaintiff*

This leaves as the remaining defendant, the District of Columbia, for which the defense

of qualified immunity is not available.  *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5

(1998).  On the issue of municipal liability, the parties have focused on the District's policies or

customs that may have contributed to the plaintiff's alleged Fourth Amendment violation.  *See*

Def. District of Columbia's Mot. Summ. J. at 9–13, ECF No. 76; Pl.'s MSJ Opp'n at 31–39.  To

resolve whether this municipal defendant may be subject to liability, however, examination of

the first prong of the *Saucier* qualified immunity test—whether a constitutional violation

occurred in the first instance—is dispositive not only of the individual defendants' entitlement to

qualified immunity but also for claim against the District of Columbia.  Consideration of all three

of the doctrines discussed *supra*, in Part III.A, compels the conclusion that the individual

defendants committed no actual Fourth Amendment violation.

### a)  *The Community Caretaking Doctrine*

The plaintiff predicates his claim of a Fourth Amendment violation on the lack of

probable cause for the search of his apartment and, in so doing, highlights Lt. Glover's

deposition testimony that this officer did not believe he needed probable cause to enter the

plaintiff's apartment because "probable cause is if we intended to arrest anybody.  We had no

30

intent to arrest anybody." Pl.'s SMF ¶ 54.  The plaintiff reasserts this contention in slightly

different language in his supplemental opposition by stating "[t]he law clearly prohibits police

officers from entering someone's apartment *to investigate* whether there might possibly be

someone else inside." Pl.'s Opp'n at 7.  Under the community caretaking doctrine, the law is not

nearly so clear; in certain contexts, the police may lawfully enter a residence to investigate

whether there might be someone else inside. *See Sutterfield*, 751 F.3d at 557.

   As noted, *supra*, in Part III.A.1, in *Hawkins*, the D.C. Court of Appeals established a four

part test for determining if the community caretaking exception applies to police action.

*Hawkins*, 113 A.3d at 221–22.  The government must show (1) "specific and articulable facts

that the government's conduct was totally divorced from the detection, investigation, or

acquisition of evidence relating to the violation of a criminal statute[;]" (2) "the government's

conduct was reasonable considering the availability, feasibility, and effectiveness of alternatives

to the officer's action[;]" (3) "the officer's action ended when the citizen or community was no

longer in need of assistance[;]" and (4) "the government's interests outweigh the citizen's

interest in being free from minor government interference." *Id.* at 222.  Lieutenant Glover's

actions meet all four prongs of the test.

   First, Lt. Glover's deposition testimony make clear that the Emergency Response Team

Entry Team did not enter the plaintiff's apartment to detect, investigate, or acquire evidence of a

statutory violation. *See id.*  Lieutenant Glover testified that he "directed the members of the

Emergency Response Team Entry Team to enter and search for any human threats that remained

or victims," and he ordered the EOD unit "to enter and check for any hazardous materials that

could remain on the scene and be dangerous to the public or anybody else in that block or area."

Pl.'s MSJ Opp'n Ex. 2 (Deposition of Lt. Robert Glover ("Glover Dep.")) 10:15-22, ECF No.

87-1.  Neither of these purposes involved searching for evidence of a statutory violation.  From an objective standpoint, the purpose of the search was directed toward identifying and assisting any individuals who may have been in the apartment after the plaintiff left, not to obtain any evidence of a crime.

Lieutenant Glover admits that the ERT had substantial uncertainty about what, if anything, the entry team members would find in the apartment.  He stated "we were not certain at that point in time whether [the plaintiff] was inside the location by himself, whether there was another person that could harm us or somebody else, whether there was any victims inside."  *Id.* 13:9-12.  The plaintiff seizes upon this uncertainty to assert that the police "point only to mere speculation that someone else might have been in Plaintiff's apartment."  Pl.'s Suppl. Opp'n at 1.  Indeed, the officers were blunt about their uncertainty whether other people were in the apartment who may have been in need of assistance.  Based on the undisputed facts available to Lt. Glover at the time, however, a reasonable officer could have believed there was a need to enter the apartment to determine, conclusively, whether any additional human threats or victims were inside.

The facts include the following:  First, Lt. Glover was informed that the plaintiff told the suicide hotline employee that the plaintiff "didn't intend to harm anyone else."  Glover Dep. 32:21.  The plaintiff highlights that the plaintiff did not "mention that he . . . planned to use firearms to hurt himself or others," *see* Pl.'s Suppl. Opp'n at 2, but that does not obviate the significance of the plaintiff's reported reference to other persons.  Second, the plaintiff's landlord stated that "there was a connection [from] her house [upstairs] to the basement," where the plaintiff had his apartment, though this assertion later proved false.  Glover Dep. 16:14-17.  Third, the landlord informed the police that the plaintiff lived alone but he had an ex-girlfriend

who would sometimes stay the night and that other people would sometimes spend the night in the plaintiff's apartment. *Id.* 17:12-16. Based on this information and the plaintiff's ambiguous statement, Lt. Glover testified at his deposition that the plaintiff "left the question open whether there was anybody else inside" his apartment. *Id.* 18:3-4. Such a conclusion is not unreasonable under the circumstances, namely, an admittedly mentally disturbed individual who had, as far as Lt. Glover knew, voluntarily called a suicide hotline, and is significantly bolstered by additional facts learned by Lt. Glover before ordering the challenged searches.

Upon learning about the plaintiff's ex-girlfriend, another officer who is not a defendant in this action, reached the ex-girlfriend on her cell phone. *Id.* 35:13-21. Based on that conversation, Lt. Glover was advised that the ex-girlfriend stated the plaintiff "had a green duffel bag inside with military items that she'd personally seen" that she had been told not to touch. *Id.* 36:17-21. She further indicated that the plaintiff was an Army veteran who served in Iraq and Afghanistan, "that he was an expert in IEDs, detection and mitigation, and that he trained other people to recognize things and handle those types of incidents." *Id.* at 37:1-5. She also stated that she and the plaintiff "had had domestic issues" and that the plaintiff had "been taking medications." *Id.* 37:5-6.

Additionally, Lt. Glover knew that the plaintiff had initially lied to officers who contacted him by stating he was at another location more than twelve blocks away when he was actually at home. *Id.* 24:3-8. Lt. Glover also believed there had been a natural gas leak in the recent past that might have resulted in the concentration of natural gas in the plaintiff's apartment. *Id.* 38:1–39:6.

Lieutenant Glover's description during his deposition of the totality of the circumstances supports his assertion that an entrance to search for other threats or victims was necessary, and

that such a search was divorced from any law enforcement, investigative purpose.  He testified that:

> [Y]ou have a veteran who's suffering from self-described posttraumatic stress disorder, taking medications, threatening to commit suicide, telling a crisis worker that he's got a gun to his head, who then calls our 911 center to dispatch [Fifth District officers].  There's a reported gas leak in the area, don't know where the girlfriend is calling from, the deception of misdirecting us to where his actual whereabouts were; the fact that we had somebody telling us that there was this bag in there with items that she had seen and couldn't really describe to us exactly what they were intended for.

*Id.* 40:7-20.  Lieutenant Glover's order to the EOD Unit to sweep the plaintiff's apartment for potential hazardous materials was similarly not motivated by any attempt to find a statutory violation.  Instead, Lt. Glover testified that the EOD Unit was sent into the plaintiff's apartment with "no intent to make an arrest.  There was no intent to do anything other than to mitigate any hazardous materials or devices that were potential [sic] inside at the time of this incident."  *Id.* 88:22–89:4.  As Lt. Glover summarized the circumstances confronting him and his fellow officers, the ERT and EOD Unit's "responsibility as the Police Department, as with the Fire Department, is to ensure public safety.  That's what was done in this matter.  We got [the plaintiff] to come out successfully unharmed.  Success."  *Id.* 149:5-9.

When viewed in the totality of the circumstances, the defendants have shown that the first prong of the *Hawkins* test is met, since no reasonable jury could find that there were not "specific and articulable facts that the government's conduct was totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."  *Hawkins*, 113 A.3d at 222.

The second prong of the *Hawkins* test considers whether "the government's conduct was reasonable considering the availability, feasibility, and effectiveness of alternatives to the officer's action."  *Id.*  In this instance, the plaintiff complains only of Lt. Glover's actions in

ordering the search of the plaintiff's home for potential additional victims and hazardous materials.  The clear implication of the plaintiff's argument that the warrantless entry of the police into his home was improper is that the police should have obtained a warrant before entering.  *See* Pl.'s Suppl. Opp'n at 6–7 (arguing police entry was improper absent "precise, articulable information that another person was inside Plaintiff's apartment, let alone injured").  The plaintiff's argument illuminates the fundamental incompatibility of traditional "probable cause" jurisprudence with entries and searches made pursuant to the community caretaking doctrine.

As the *Sutterfield* court pointed out, the community caretaking doctrine "presumes that the police are not acting for any law enforcement purpose," thus rendering the question of "whether or not there is time to seek a traditional criminal warrant [] immaterial."  *Sutterfield*, 751 F.3d at 561.  The *Sutterfield* Court further explained, "whether there was time to seek a warrant loses its relevance in the emergency aid subset of exigency cases.  The passage of time may remain relevant as a measure of whether there was a true emergency justifying the intrusion into someone's home, but not in terms of whether a warrant could have been sought." *Id*. at 564.  The record is clear that the entry into the plaintiff's apartment ordered by Lt. Glover was not motivated by a search for evidence of a crime.  *See* Glover Dep. 18:7-10 ("[W]e have to do due diligence to go inside and make sure there's no victims or anybody else that can remain to hurt anybody else.").  Indeed, Lt. Glover asserts affirmatively that he did not have probable cause to enter, stating "[e]ntry wasn't made on probable cause.  There was no crime that we knew of at that point in time." *Id*. 41:13-15.

It is hornbook law that a police officer seeking to enter a private residence without consent must present a neutral magistrate with sufficient probable cause to believe that evidence

of a crime would be uncovered during a specific search of the residence.  *See Sutterfield*, 751

F.3d at 561.  In cases where the community caretaking doctrine is applied, such recourse to a

neutral magistrate is unavailable since, by definition, the police are not entering a private

residence to search for evidence of a crime; rather, they are entering the residence to protect

public safety.  *See id.*  This is precisely the situation described by Lt. Glover.  He states the ERT

and EOD Unit "weren't investigating a crime . . . . [i]t's not a crime to threaten to commit

suicide," when they entered and searched the plaintiff's apartment.  Glover Dep. 41:22-42:2.  In

Lt. Glover's view, the ERT and EOD Unit's role was "to keep everybody safe including anyone

that may remain in the apartment," using skills and training that "exceed[] the capability of basic

patrol officers."  *Id.* 42:8-12.  Lieutenant Glover notes that there was no way for the officers on

the scene to know "that [the plaintiff] hadn't cut somebody up or tied them up in the bathroom

that [they] didn't know about."  *Id.* 42:13-15.  "[I]t's irresponsible not to check on the welfare

and with hundred percent certainty make sure nobody else is inside that's being either victimized

or being held against their will that we don't know about."  *Id.* 42:20–43:1.

Thus, to accomplish Lt. Glover's goal—to ensure there were no other human victims or

threats inside the plaintiff's apartment and that the apartment was clear of hazardous materials,

*see id.* 42:20–43:1; 44:9-17—the police had either to obtain the plaintiff's voluntary consent to

enter or effect a warrantless entry.  The plaintiff admits that he locked his front door to prevent

the officers from entering his apartment.  Pl.'s MSJ Opp'n Ex. 1 (Deposition of Plaintiff ("Pl.'s

Dep.")) 77:12-17, ECF No. 87-1 ("And when I opened the door and came out, I pulled the door

shut securely to make sure that my dog could not get out.  And then also I did not want anybody

in my apartment.  So the door was locked, and I was on the outside.").  The plaintiff avers that at

least one officer asked the plaintiff "for the key to [his] apartment," to which the plaintiff

responded he was "not giving [the officer] consent to go into [the plaintiff's] place." *Id.* 94:12-14.  Consequently, the second prong of the *Hawkins* test is met since, to fulfill their community caretaking responsibility, the officers' had no alternative to the warrantless entry, given the absence of probable cause sufficient to obtain a criminal warrant and the plaintiff's election not to give consent to a search.[11]

The third prong of the *Hawkins* test asks whether "the officer's action ended when the citizen or community was no longer in need of assistance." *Hawkins*, 113 A.3d at 222.  In the instant matter, Lt. Glover ordered two searches: one by the ERT to search for people, and one by the EOD Unit to search for "any hazardous materials that could continue to harm somebody if left on the scene."  Glover Dep. 43:9-15; 44:9-17.[12]  After the ERT determined the plaintiff's apartment contained no other persons, the EOD Unit was asked to clear the apartment for "any hazardous materials or devices," *id.* 57:16, based on Lt. Glover's "[u]nderstanding [of] the potential for [the plaintiff] to be in possession of military items, based upon his military service . . . the previously detected odor of natural gas, and his current mental state," *id.* 59:6-12.

In response to the plaintiff's counsel's question at his deposition, Lt. Glover explained via a hypothetical why the EOD unit was required before Lt. Glover could be assured the "community was no longer in need of assistance."  *See Hawkins*, 113 A.3d at 222.  Lieutenant Glover noted that if the police "allow the landlady," who lived above the plaintiff's apartment, "to go back upstairs thinking everything's fine and everything's been dealt with," despite the

---

[11] The *Hawkins* court noted that District of Columbia law "does not require the government to pursue the least restrictive means of correcting the problem" that gave rise to the officer's action.  *Hawkins*, 113 A.3d at 222.

[12] A third entry of the plaintiff's apartment was conducted by the MPD's "Crime Scene Search" team, but that search was not ordered by Lt. Glover, nor did it involve any of the remaining individual defendants in this matter. *See* Glover Depo. 156:10-21 (noting scene was returned to control of Fifth District officers after EOD unit left); Incident Rep. at 5 ("All other evidence was recovered by Crime Scene Search.").  This third search is, therefore, not properly before the Court.  It was during this third search that the plaintiff's weapons were seized, *see* Incident Rep. at 5, which unregistered weapons provided the basis for the subsequent criminal charges against the plaintiff.

earlier concern about a gas leak and potential military equipment, the police would be responsible if "[t]he gas gets turned back on, somebody throws a light switch, [and] the place blows up."  Glover Dep. 63:10-14.  In other words, given the information available to Lt. Glover at the time the ERT had cleared the plaintiff's apartment, uncertainty remained as to whether the threats to the community had been fully abated.

During the EOD Unit search, several firearms were located in the plaintiff's apartment. *Id.* 156:10-12 (noting Lt. Glover "made sure somebody from [the Fifth District] was still inside [the plaintiff's apartment] based upon the fact that we had unsecured firearms inside at that point.").  Along with the firearms, the EOD unit located fireworks, which were "turned . . . over . . . [to] the fire marshal's office," while a "military whistler device and smoke canisters that were fused were taken down to the EOD bunkers and secured into the bunkers that are required to secure those types of devices."  *Id.* 156:13-17.  Lieutenant Glover avers that the searches he ordered ended once the plaintiff's apartment was deemed to be secure from hazardous materials and free of victims.  *Id.* 150:10-13 ("Once all hazards and threat to public safety were a hundred percent guaranteed, concluded, mitigated, handled, contained, responded to, we turn that scene back over to the requesting district.").

The plaintiff contends that no exigent circumstances justified the search because any threat dissipated once the plaintiff had left the apartment.  *See* Pl.'s Suppl. Opp'n at 8.  The plaintiff relies, in part, on a Fourth Circuit case, *Yengel v. United States*, 711 F.3d 392 (4th Cir. 2013), for the proposition that "'the presence of explosive materials must be tied to objective facts that sufficiently increase the likelihood, urgency, and magnitude of the threat to the level of an emergency' and that the 'possible existence of a stable, inert explosive device, without objective facts that increase the threat of danger, does not create an exigency to justify a

warrantless search.'"  *Id.* at 6 (quoting *Yengel*, 711 F.3d at 398).  Under *Yengel*, the plaintiff

contends, the EOD Unit's search of the plaintiff's apartment was not supported by exigent

circumstances.  *Id.* at 8.

      *Yengel* is easily distinguishable from the instant matter, however.[13]  First, *Yengel* was a

criminal case where the exclusion of evidence was at issue, and the Fourth Circuit was reviewing

a District Court's suppression of evidence for "clear error."  *Yengel*, 711 F.3d at 396.  This is a

decidedly more deferential standard than the objective, *de novo* inquiry this Court must

undertake in the instant matter to assess the reasonableness of the defendants' actions.  The scale

in *Yengel*, due to the District Court's suppression of the evidence in question, was weighted

against a finding of reasonableness.  *See id.*

---

[13] The defendants rely upon *Mora v. City of Gaithersburg*, 519 F.3d 216 (4th Cir. 2008), to bolster the defendants' contention that exigent circumstances existed to justify the searches of the plaintiff's apartment.  *See* Defs.' Suppl. Mem. at 8–9; Defs.' Suppl. Reply at 5–6.  *Mora* is supportive of the defendants' position, but several key differences between *Mora* and the instant matter limit its usefulness to the present analysis.  In *Mora*, a firefighter called a "healthcare hotline operator" and told her he was "suicidal, had weapons in his apartment, could understand shooting people at work, and said 'I might as well die at work.'"  *Mora*, 519 F.3d at 220.  One of the plaintiff's co-workers told police officers that the plaintiff's implicit threat to execute a workplace shooting "should be taken seriously."  *Id.*  Within eleven minutes of police receiving the call from the healthcare hotline operator, the plaintiff was in custody, but police proceeded to enter the plaintiff's apartment after the arrest without a warrant.  *Id.*  Inside the apartment, police found "twelve handguns, eight rifles, one shotgun . . . ammunition, gun accessories, and what police called 'survival literature' in every room but the bathroom.'"  *Id.*

The Fourth Circuit affirmed the reasonableness of the search, highlighting the police officers' reasonable belief that the plaintiff in *Mora* was about to commit a mass murder at his workplace.  *Id.* at 219 (citing shootings at Columbine High School, Virginia Tech, and workplaces in Omaha and Oklahoma City as examples of people "isolated but heavily armed, filled the brim with rage and aguish, and bent not just on murder, but on indiscriminate slaughter followed, frequently, by suicide"); *id.* at 223 (opining that "[p]olice [] simply must be entitled to take effective preventive action when evidence surfaces of an individual who intends slaughter" and collecting cases where school districts' decisions to expel or suspend students suspected of planning a mass shooting were upheld); *id.* at 226 ("Our analysis begins with what the district court called the 'salient, primary fact' in this case: the overwhelming justification police had for rushing immediately to [the plaintiff's] home and taking him into custody. [The plaintiff's] phone call to the hotline operator, as she reported it to the police, showed a man on the edge, a man who was armed, suicidal, and inclined to kill his co-workers on the way out.  His last, chilling remark, 'I might as well die at work,' was ambiguous to be sure, but it intimates a massacre, and his co-worker confirmed that the threat was serious.").

By contrast to *Mora*, the plaintiff here did not make the type of confirmed, overt threat to others that the Fourth Circuit concluded was the "salient, primary fact" for its holding.  *See id.* at 226.  The egregious nature of the threat in *Mora* thus reduces its comparability to the facts in the instant matter.  Nevertheless, the defendants are correct that *Mora* supports the defendants' contention that a warrantless search of an apartment after a suicidal suspect has left may be reasonable under the Fourth Amendment, depending on the associated context.

Second, in *Yengel*, the police officer on the scene was told by the defendant's wife that the defendant kept "a large number of firearms and a 'grenade' inside the [defendant's] house," but that the "grenade" was in a guest bedroom closet, which "was locked with a combination keypad and thumbprint scanner." *Id.* at 395. The officer "did not notify explosive experts, did not evacuate the house or nearby homes, did not remove [a] sleeping child from the room located directly next to the room where the 'grenade' was allegedly stored" and "simply pried open the closet with a screwdriver." *Id.* After the officer saw "a variety of military equipment" inside the closet, he evacuated the defendant's house and surrounding houses and called in an EOD unit. *Id.* The Fourth Circuit held that exigent circumstances did not exist to justify the officer's warrantless entry into the locked closet because, *inter alia*, the threat from the "grenade" was "stable" and "the scope of any danger was quite limited[;]" the "immobile and inaccessible location of the threat further diminished the scope of any possible danger" since the item was "inside a locked closet . . . to which neither [the defendant's wife], nor anyone else other than [the defendant], had ready access[;]" and "no officers on the scene sought to evacuate the nearby residences, or, in particular, to evacuate [the defendant's wife's] young son who was sleeping in the room *directly next to the alleged grenade*" until after forcing entry into the locked closet. *Id.* at 398–99 (emphasis in original).

*Yengel* stands in stark contrast to the instant matter. Here, the defendants did not know the precise nature of the threat and whether any explosive devices were "stable," Glover Dep. 36:17–37:1 (noting plaintiff's ex-girlfriend had told police of a green duffel bag with "military items that she'd personally seen" but the ex-girlfriend "couldn't tell us exactly what was in the bag"). The defendants had no idea whether potential hazardous materials were in secured containers, such as the locked closet in *Yengel*, prior to the inspection of the apartment by the

EOD unit.  Finally, the defendants had initiated an evacuation of surrounding residences and cordoned off the area well before any entry attempt was made or any EOD search conducted. *See id.* 31:8-11 (noting Lt. Glover's position throughout incident was "a safe distance away inside one of our command trucks with, I would say, two and a half, three blocks south of the incident"); 63:11 (noting upstairs neighbor needed to be "allow[ed] . . . to go back upstairs" to her residence).  The threat in *Yengel* was known, secured, and stable, while the threat in the instant matter, as understood by the police officers, was unknown, possibly unsecure and possibly unstable.  At best, from the plaintiff's perspective, *Yengel* is inapposite to the instant matter and, at worse, militates in favor of the reasonableness of the defendants' actions.

In any event, the searches that Lt. Glover ordered to be conducted by the ERT and the EOD Unit did not continue beyond the point at which the plaintiff's apartment was rendered clear of potential victims, threats, and hazardous materials.  Consequently, the third *Hawkins* prong is satisfied.

The fourth and last *Hawkins* prong is a balancing test measuring whether "the government's interests outweigh the citizen's interest in being free from minor government interference."  *Hawkins*, 113 A.3d at 222.  This balancing weighs heavily in favor of the defendants.  As the Supreme Court has noted, "concern for the safety of the general public who might be endangered" is a legitimate reason to conduct a warrantless search under the community caretaking doctrine.  *See Cady*, 413 U.S. at 447.  Lieutenant Glover ordered the ERT and EOD unit searches with the express purpose of identifying and providing aid to any individuals who may have been inside the plaintiff's apartment and unknown to the police, and securing any hazardous materials so as to protect the people in the building and surrounding neighborhood.  *See supra* Part III.B.2.a.  With respect to both searches, Lt. Glover was acting not

41

in his law enforcement capacity but in his role as a protector of public safety, which is a substantial government interest. *See Brigham City*, 547 U.S. at 406 ("The role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties . . . .").

To be sure, the Fourth Amendment "unequivocally establishes the proposition that 'at the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Payton v. New York*, 445 U.S. 573, 589–90 (1980) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)) (alterations in original). The Fourth Amendment requires an assessment of the reasonableness of a given intrusion, with only "unreasonable searches" violating the rights guaranteed by the Constitution. *See* U.S. CONST. AMEND. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."). Ultimately, this reasonableness requirement is at the core of each of the three doctrines detailed *supra* in Part III.A. In this instance, the plaintiff's interest in his own privacy within his home pales in comparison to the need for the defendants to determine if anyone else was injured inside his apartment after the plaintiff surrendered to the police and if the plaintiff's apartment represented a threat to community safety. The fourth prong of the *Hawkins* test is therefore met.

Since Lt. Glover has shown that no rational jury could find that his orders to the ERT to conduct a search for potential human threats or victims, and to the EOD Unit to conduct a search for hazardous materials in the plaintiff's apartment, were unreasonable under the community caretaking doctrine, the Court holds that the warrantless entry and search of his home by the ERT and OED Units did not violate the plaintiff's Fourth Amendment right. Consequently, the

individual defendants are, again, entitled to qualified immunity under the first *Saucier* prong and to summary judgment.  *See Doe*, 2015 WL 4727142, at *5.

Yet, the fuzzy contours of the community caretaking doctrine give the Court pause. While the D.C. Court of Appeals, in explicitly adopting the doctrine, declined to limit its application to automobile searches, and, indeed, seemed implicitly to extend the doctrine to the home by citing *Brigham City*, *see Hawkins*, 113 A.3d at 222, *Hawkins* was, after all, a case involving an automobile, *id.* at 221.  The D.C. Circuit does not appear to have addressed the community caretaking doctrine and its potential application to warrantless searches of homes at all.  Thus, if the community caretaking doctrine does extend to permit warrantless entries and searches of homes under appropriate circumstances, the individual defendants' actions fit comfortably within the doctrine here, and no Fourth Amendment violation occurred under application of this doctrine.  *See Sutterfield*, 751 F.3d at 561 ("As a matter of doctrine, then, the community caretaking doctrine would potentially be the best fit for this case, in that it captures the beneficent purpose for which the police entered [the plaintiff's] home").  Even if the community care doctrine does not extend to homes in this Circuit, however, the officers' actions were also justified under the exigent circumstances and emergency aid doctrines, each of which is discussed below.

> b)      *The Exigent Circumstances Doctrine*

Determining whether the exigent circumstances doctrine excused the need for a warrant and for probable cause in conducting a search is, similarly to the community caretaking doctrine, a question of reasonableness.  *See Goree*, 365 F.3d at 1089.  The test is objective and takes into account the "totality of the circumstances" confronting the official asserting the doctrine.  *Id.*  As noted, such a search is reasonable provided that it is "no broader than necessary," *Mason*, 966

F.2d at 1492, and "strictly circumscribed by the exigencies which justify its initiation," *Goree*, 365 F.3d at 1090 (quoting *Mincey*, 437 U.S. at 393) (internal quotation marks omitted).

Lieutenant Glover identifies "'[t]he need to protect or preserve life or avoid serious injury,'" *id.*, as the exigency justifying the two searches he ordered of the plaintiff's apartment. *See, e.g.*, Glover Dep. 13:13-14 ("So the exigency remained, and the team entered and cleared for any human hazards or threats"); *id.* 16:3-7 ("Main priority was making sure [the plaintiff] was safe, and to make sure that everybody else remained safe, and that there was [sic] no other continued human hazards inside the [apartment] at that point in time"); *id.* 42:10-12 ("we have a responsibility to keep everybody safe including anyone that may remain in the apartment").

As discussed, *supra*, it was objectively reasonable for Lt. Glover to believe that, even after the plaintiff exited his apartment, a continuing need existed to check for any potential human victims or threats, warranting his orders for the ERT to sweep the plaintiff's apartment, and the EOD Unit to sweep for hazardous materials. *See supra* Part III.B.2.a.  Thus, the only question as to whether the exigent circumstances doctrine properly applies to Lt. Glover's orders pertains to whether the searches were "broader than necessary," *Mason*, 966 F.2d at 1492, or exceeded the "strictly circumscribed" scope delineated "by the exigencies which justify" the search, *Goree*, 365 F.3d at 1090.

The plaintiff offers two challenges to the application of the exigent circumstances doctrine: (1) when the apartment was searched, the "Plaintiff was seized and posed no threat to himself or to others," Pl.'s Suppl. Opp'n at 1, and (2) Lt. Glover had no reason to believe additional people or hazardous materials were present in the plaintiff's apartment, *id.* at 1–2. Neither argument is persuasive.

44

First, the plaintiff argues that the exigent circumstances, if they existed, ended when the plaintiff was seized.  *See id.* at 6–7 (noting "Plaintiff was seized" when search took place and "Plaintiff posed no threat to himself or others" after he was seized).  This argument misses the point: the exigent circumstances doctrine encompasses not only the actions the plaintiff may take in the future, but also the actions the plaintiff has already taken, or could cause to be taken after his seizure ceased.  The D.C. Circuit's reasoning in *Hendrix* effectively rebuts the plaintiff's argument on this score.

In *Hendrix*, police were called to the scene of an alleged domestic violence incident.  *Hendrix*, 595 F.2d at 884.  Before the police arrived, the defendant's wife had already left the apartment where "a violent day-long argument" had occurred, but her baby remained in the apartment with her husband.  *Id.*  Upon their arrival, the defendant's wife asked the police to "get her baby and take the sawed-off shotgun out of her house," since her husband had threatened her with the gun.  *Id.*  The police talked the defendant out of the apartment without incident, but when "he continued threatening his wife (in front of the police) . . . . he was placed under arrest for disorderly conduct."  *Id.* at 885.  Following the defendant's arrest, the police took the keys from him and entered the apartment to seize the sawed-off shotgun.  *Id.*

As noted *supra* in Part III.A.2., the D.C. Circuit in *Hendrix* held the search constitutional on two grounds: consent and exigent circumstances.  *Id.*  Also, as previously noted, since consent to search was only given by the defendant's wife, not the defendant, the consent basis for the holding was abrogated by the Supreme Court's ruling in *Georgia v. Randolph* that "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to" the non-consenting resident "on the basis of consent given to the police by another resident."  547 U.S. at 120.  Nevertheless, the

45

alternative basis for the *Hendrix* Court's ruling remains good law: even if consent had not been given, the search was still justified on the basis of exigent circumstances alone, a conclusion cited with approval by the *Randolph* Court.  *See id.* at 119.

The D.C. Circuit noted that even though the defendant in *Hendrix* was out of the apartment and in custody, a "threat to human life," namely, the threat to the defendant's wife and baby, "was obviously present" due to "the existence of the contraband sawed-off shotgun on the premises and available for use by Hendrix."  *Hendrix*, 595 F.2d at 886. The "early hour" of the seizure ensured that "it would have taken at least a few hours to obtain a warrant, during which period appellant, who had been arrested merely for disorderly conduct, likely would have been able to secure his release, return home, and conceal or use the shotgun again." *Id.*  Moreover, the D.C. Circuit found probative the fact that the police "were informed at the scene that [the defendant] possessed a sawed-off shotgun[,] which under federal law is a contraband article" and the defendant's wife "appeared hysterical and was obviously worried about what her husband might do." *Id.*

In the instant matter, the plaintiff was believed to be suicidal, Glover Dep. 19:16-20, and Lt. Glover had been informed that the plaintiff possessed firearms and "military items," *id.* 36:18.  When the plaintiff left his apartment, he was not placed under arrest, but was instead taken for evaluation at a medical facility.  *Id.* 47:21–48:2 ("There was no intent to lock up [the plaintiff] that morning.  It's not ERT's responsibility.  It's not EOD's responsibility.  We weren't going in to look for evidence."); *id.* 149:14-18 (noting Fifth District officers' "intent was not to arrest [the plaintiff]" and that "the morning of this incident . . . a PD 251 incident report was taken, not an offense report, for sick person to the hospital.").  Indeed, in his deposition, Lt.

Glover described the difficulty with obtaining a warrant, had a warrant been necessary in this situation, due to the time of the incident:

> If it's after hours, it can take – if you can get things in line where somebody will answer the phone and you don't have to call down through the next attorney in line to review the affidavits, and you can find the first on-call judge, and they're actually awake and answer the phone, it can take anywhere from four to five hours or longer.  And I've had it on a weekend when I was in homicide where we had to wait 12 hours to process a crime scene that had no exigent factors or circumstances, we knew there were no victims inside, there was no armed threat to anybody, there was no continuing danger, where we secured the premises and waited 12 hours.  That was not the case in this situation.

Glover Dep. 147:11–148:3.  Thus, the plaintiff's assertion that the "exigent circumstances were dispelled once Plaintiff was seized," Pl.'s Suppl. Opp'n at 10, is plainly belied by the D.C. Circuit's decision in *Hendrix*, given the analogous factual circumstances between the two cases.

As for the plaintiff's second argument, that Lt. Glover had no reason to believe that there were other individuals or hazardous materials in the plaintiff's apartment, the Court has already addressed and rejected that argument.  *See supra* Part III.B.2.a.  Lieutenant Glover had an objectively reasonable belief that it was necessary to sweep the plaintiff's apartment for potential human victims, threats, or hazardous materials.  *See id.*  The plaintiff does not dispute that the ERT and EOD Unit did nothing more than search for people and hazardous materials.  *See generally* Pl.'s MSJ Opp'n; Pl.'s Suppl. Opp'n.  Rather, the plaintiff asserts that the search itself was unreasonable due, in the plaintiff's view, to the lack of evidence supporting the continued existence of an exigency.  Pl.'s Suppl. Opp'n at 9 ("[W]hen [E]OD entered and searched, after ERT searched and found no one in the apartment, any reasonable suspicion of imminent danger was already dispelled.").  Thus, this second argument fails as well, since the searches ordered by Glover, for people, threats, and hazardous material, were strictly tailored to the exigency that existed—the potential presence of other victims and the potential presence of hazardous materials—and, at least insofar as Lt. Glover and his ERT and EOD Unit were concerned, lasted

no longer than it took to dispel the exigency. *See Mason*, 966 F.2d at 1492; *Goree*, 365 F.3d at 1090.[14]

Based on the totality of the circumstances, Lt. Glover's actions to order a search of the plaintiff's apartment for potential human victims, threats, and hazardous materials were reasonable, since he was faced with an admittedly unstable individual who had called a suicide hotline, admitted to having firearms, lied to investigators about his whereabouts, and was known to possess unknown military items. Therefore, under the exigent circumstances doctrine, Lt. Glover's orders to search the plaintiff's apartment were not unreasonable and, thus, did not violate the plaintiff's Fourth Amendment rights.

### 3. *The Emergency Aid Doctrine*

Lieutenant Glover's orders to search the plaintiff's apartment for people, threats, and hazardous materials, fits comfortably within the emergency aid doctrine, in addition to the exigent circumstances doctrine and the community caretaking doctrine. To the extent that the emergency aid doctrine differs from the exigent circumstances doctrine, the emergency aid doctrine requires only an objectively reasonable belief "that it was necessary to enter a home in order to 'render assistance or prevent harm to persons or property within.'" *Sutterfield*, 751 F.3d at 557–58 (quoting *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1244 (7th Cir. 1994)); *Hopkins v. Bonvicino*, 573 F.3d 752, 763 (9th Cir. 2009) (noting exception to warrant and probable cause requirement where officer "has 'reasonable grounds' to believe an emergency is at hand and that [the officer's] immediate attention is required"); *United States v. Jenkins*, 329 F.3d 579, 581 (7th Cir. 2003) (affirming reasonableness of warrantless search based on "reasonabl[e] fear[] for the safety of someone inside the premises" where, after responding to reported assault, officer found

---

[14] To reiterate, Lt. Glover, Sgt. Pope and Ofc. Leone were not present when the plaintiff's firearms were seized, which was the seizure at issue in the underlying criminal matter. *See supra* Part I.

front door to residence open and heard noise "that sounded like a person standing up and falling

down"); *United States v. Moss*, 963 F.2d 673 (4th Cir. 1992) (noting cases in which "warrantless

entry into self-storage warehouse units [was] proper where doors [were] visibly forced, in order

to protect property" and where "police responded to [a] report of [a] stabbing").  The Supreme

Court recently reaffirmed this doctrine in *Sheehan*, affirming the 9th Circuit's finding that a

warrantless entry into a home was justified under the emergency aid exception, since "[l]aw

enforcement officers may enter a home without a warrant to render emergency assistance to an

injured occupant or to protect an occupant from imminent injury."  *Sheehan*, 135 S. Ct. at 1774–

75 (quoting *Brigham City*, 547 U.S. at 403); *see also Evans v. United States*, No. 13-CM-1173,

2015 WL 4714146, at *2 (D.C. Aug. 6, 2015) (noting District of Columbia recognizes

"emergency aid" exception provided "police have 'probable cause to believe that immediate

entry [was] necessary,'" but cautioning previously recognized test might be more stringent than

that required by *Brigham City* (quoting *United States v. Booth*, 455 A.2d 1351, 1355 (D.C.

1983)).

In the instant matter, this test for the emergency aid doctrine is plainly met. Lieutenant

Glover had an objectively reasonable belief that other people could have been in the plaintiff's

home who were in need of assistance or were in danger of harm, thus necessitating the entry of

the ERT.  *See supra* Part III.B.1.a–b.  In addition, Lt. Glover's belief that the presence of

"military items" could represent hazardous materials in need of mitigation, such that the EOD

Unit's search was necessary to prevent harm to people or property, was also objectively

reasonable.  *See id.*  As the Supreme Court noted in *Brigham City*, "[t]he role of a peace officer

includes preventing violence and restoring order, not simply rendering first aid to the casualties;

an officer is not like a boxing (or hockey) referee, poised to stop a bout only if it becomes too

one-sided." 547 U.S. at 406.  Rather, Lt. Glover acted in an objectively reasonable manner in ordering the searches of the plaintiff's apartment in this instance both to "render[] first aid to [any] casualties" and to prevent the occurrence of another "bout" that threatened community safety.

Thus, if Lt. Glover's actions were not justified by the community caretaking doctrine and the exigent circumstances doctrine, which they were, they were justified by the emergency aid doctrine since the ERT and EOD Units' searches were designed only to identify and provide aid to potential individuals who may have been need of assistance and to prevent any further harm to the plaintiff's property or surrounding resident's property caused by any hazardous materials remaining.

*     *     *

Under the community caretaking, exigent circumstances, and emergency aid doctrines, Lt. Glover's orders to the ERT and EOD Unit to enter without a warrant and search the plaintiff's apartment for people, threats, and hazardous materials were objectively reasonable and, therefore, did not violate the plaintiff's Fourth Amendment rights.  Lieutenant Glover is, consequently, entitled to qualified immunity.  Since the searches were reasonable, and Sgt. Pope and Ofc. Leone merely participated in the searches, *see supra* Part I, these two individual defendants are similarly entitled to qualified immunity.[15]  Summary judgment is granted to the three individual defendants.

---

[15] Sgt. Pope and Ofc. Leone would also likely be entitled to qualified immunity since the parties do not dispute that these individual defendants were merely following the orders given by Lt. Glover in executing the two searches. *See Elkins v. District of Columbia*, 690 F.3d 554, 568–69 (D.C. Cir. 2012) (noting an officer is entitled to "'rely on a fellow officer or agent who does (or by position should) know the substantive law and facts and who (based on that knowledge) asserts' that some action is lawful." (quoting *Liu v. Phillips*, 234 F.3d 55, 57 (1st Cir. 2000)).  The plaintiff's contention that *Wesby v. District of Columbia*, 765 F.3d 13, 29 (D.C. Cir. 2014), militates in favor of liability for these two defendants is unpersuasive.  Pl.'s Suppl. Opp'n at 12.  In *Wesby*, the officers held personally liable for false arrest "were actively involved in surveying the scene and gathering information regarding the Plaintiffs' knowledge and reason" for their allegedly unlawful presence in a home, a critical element for the offense

### C.      The Municipal Defendant Is Entitled To Summary Judgment

Since the Court has found that the individual defendants did not violate the plaintiff's Fourth Amendment rights, the dismissal of the municipal defendant must follow.  "To hold the District liable, the [plaintiff] must show (1) a Constitutional violation, and (2) that the District was responsible for that violation."  *Doe*, 2015 WL 4727142, at *7.  The plaintiff has failed to show a constitutional violation.  *See supra* Part III.B.2.  Inevitably, then, any potential § 1983 claim against the District of Columbia must fail and summary judgment must be granted to the municipal defendant.  *See id.*[16]

## IV.   CONCLUSION

Resolution of Fourth Amendment challenges that turn on the objective reasonableness of police action requires consideration of the totality of the circumstances. *Ohio v. Robinette*, 519 U.S. 33, 34 (1996) (noting that touchstone of Fourth Amendment is reasonableness, which "is measured in objective terms by examining the totality of the circumstances"). Consequently, context matters.  Without context, the defendants' actions in this case appear to be a textbook example of a Fourth Amendment violation: the defendants ignored the plaintiff's explicit refusal

---

for which the plaintiffs were arrested.  *Wesby*, 765 F.3d at 28–29.  By contrast, in the instant matter, the plaintiff has failed to show that either Sgt. Pope or Ofc. Leone conducted any independent review of the facts at the scene contributing to the need for the search prior to their entrance into the plaintiff's apartment on Lt. Glover's orders. Whether either defendant was following an MPD "unwritten policy," Pl.'s Suppl. Opp'n at 12–13, is immaterial, since these defendants were (1) expressly ordered to conduct the two searches and (2) those searches were non-violative of the Fourth Amendment.  In sum, even if the searches did violate the Fourth Amendment, which they did not, and even if the right violated were clearly established, which it was not, these two defendants would still be entitled to qualified immunity since they were under no obligation to verify independently that the orders issued by Lt. Glover were lawful.  *See Elkins*, 690 F.3d at 568–69.

[16] Although neither party, in their supplemental memoranda, addressed the question of continued viability of the plaintiff's claim against the District of Columbia, the plaintiff has conceded in previous submissions that a "jury must find one or more of the individual defendants to have violated Plaintiff's constitutional right to be free from an unreasonable search of his dwelling before the jury can find that a District policy also caused that violation."  Pl.'s Suppl. Briefing at 1, ECF No. 116.  Since the Court has found that no reasonable jury could find that any individual defendant violated the plaintiff's Fourth Amendment right, *see supra*, a jury, *a fortiori*, could not find that a "District policy also caused [a] violation."  *Id.*  Consequently, reconsideration of the Court's previous denial of the District of Columbia's motion for summary judgment is warranted based on the grant of summary judgment to the individual defendants.

to consent to a search and, without a warrant and without probable cause, broke down the locked door to the plaintiff's apartment and searched it.  Indeed, the "intrusions upon [the plaintiff's] privacy were profound" and reach "the core of the privacy protected by the Fourth Amendment," namely: "the right to be let alone in one's home." *Sutterfield*, 751 F.3d at 550–551 (citing *Kyllo v. United Stat*es, 533 U.S. 27, 31 (2001); *Silverman*, 365 U.S. at 511; *Payton*, 445 U.S. at 589–90).  "Although the officers took each of these actions for benevolent reasons, from [the plaintiff's] perspective—and from the perspective of anyone in a similar situation who did not wish assistance—these were serious intrusions upon the sanctity of [the plaintiff's] home and [] person." *Id.* at 551.

Yet, this view tells only half the story.  In context, the defendants were confronted with an admittedly armed, mentally ill, potentially suicidal subject, who ignored police entreaties to exit his home for hours, triggering a "barricade" situation with dozens of police officers surrounding the home with the sole purpose of preventing a tragedy.  The police knew the subject's ex-girlfriend was alive, but they did not know where she was and she had told them about her "domestic issues" with the plaintiff.  The plaintiff was a veteran known to keep military equipment of an unknown type in his residence, and the first officers on the scene encountered a smell of natural gas so strong that they instructed the gas company to shut off service to two homes.  When the plaintiff finally emerged, he locked his door and told police officers he did not want them going inside his apartment.  Under these circumstances, and under the exceptions to the Fourth Amendment's warrant and probable cause requirements recognized by the Supreme Court, the D.C. Circuit, and the D.C. Court of Appeals, the plaintiff did not suffer a constitutional violation when the police entered his home solely to determine whether any people, threats, or hazardous materials were inside.

Accordingly, the Court vacates its prior orders denying summary judgment to the individual defendants—Lt. Glover, Sgt. Pope and Ofc. Leone—and the District of Columbia, and grants summary judgment to those defendants.  Since this Memorandum Opinion resolves all claims against all remaining defendants, the plaintiff's and defendants' three pending Motions *in limine*, ECF Nos. 104–06, are denied as moot.

An Order consistent with this Memorandum Opinion will issue contemporaneously.

Date: August 25, 2015

_____

BERYL A. HOWELL
United States District Judge