# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MATTHEW CORRIGAN,

                Plaintiff,

                v.

ROBERT GLOVER, *et al.*

                Defendants.

Civil Action No. 12-173 (BAH)

Chief Judge Beryl A. Howell

## MEMORANDUM OPINION

The plaintiff, Matthew Corrigan, brought this lawsuit, pursuant to 42 U.S.C. § 1983, against the District of Columbia and over twenty named and unnamed officers of the Metropolitan Police Department ("MPD"), seeking damages for violation of his Fourth Amendment rights arising from a warrantless search of his home on February 3, 2010. *See generally* Compl., ECF No. 1; First Am. Compl. ("FAC"), ECF No. 11. During the ensuing litigation, twenty-two of the individual defendants were dismissed voluntarily by the plaintiff or their motions to dismiss or motions for summary judgment were granted.[1] This Court then granted the motions for summary judgment by the four remaining defendants, the District of Columbia, Lieutenant Robert Glover, Sergeant Kevin Pope, and Officer Mark Leone, ruling that no violation of a clearly established right had occurred and that the officers were entitled to qualified immunity. *See Corrigan v. District of Columbia*, Civil No. 12-173 (BAH), 2015 WL

---

[1] The motions to dismiss of Defendants Mark Beach and Burt Henry were granted in November 2013. *See* Memorandum and Order (Nov. 18, 2013), ECF No. 69. Defendant Fabian Ferrera's motion for summary judgment was granted, as conceded, on March 6, 2015. *See* Minute Order (March 6, 2015). The plaintiff voluntarily dismissed the following named defendants: Wendell Cunningham, Joseph Dolan, Thomas Miller, Peter Schumacher, Daryl Thompson, Joseph Williams, Charles Yarbaugh, James Greene, Dorian DeSantis, Jeffrey Henderson, Darrell Isom, William Powell, Joy Preston, Paul Riggins, Hogan Samels, William Washington, Carlton Wicker, Sr., William Wright, and Lawrence Heinz. *See* Minute Orders (Sept. 15, 2014; July 21 and 28, 2015; and Aug. 13, 2015).

5031364 (D.D.C. Aug. 25, 2015). This ruling was subsequently affirmed in part and reversed in part by the D.C. Circuit. *See Corrigan v. District of Columbia*, 841 F.3d 1022 (D.C. Cir. 2016).

Although before this Court the parties, in examining the totality of the circumstances, *see Grady v. North Carolina*, 135 S. Ct. 1368, 1371 (2015) (noting "reasonableness of a search depends on the totality of the circumstances, including the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations"), treated the challenged MPD search as a single, continuous incident, the D.C. Circuit delineated two distinct searches based on the different purpose and scope of the searches conducted of the plaintiff's basement apartment by two separate MPD units, *see* Pl.'s Statement of Material Facts ("Pl.'s SMF"), Ex. 2, Dep. of Lt. Robert Glover ("Glover Dep.") at 38:13, ECF No. 87-1 (describing the plaintiff's home as an "English basement apartment"). Specifically, the D.C. Circuit concluded that while the MPD officers involved in the first search, conducted by the MPD's Emergency Response Team ("ERT"), were entitled to qualified immunity, *Corrigan*, 841 F.3d at 1035 ("For the brief and limited warrantless ERT 'sweep' of Corrigan's home, the officers had a sufficiently reasonable basis for believing there was probable cause to look for a potentially injured and incapacitated person as to entitle them to qualified immunity."), the MPD officers involved in the second search, conducted by the MPD's Explosive Ordinance Disposal unit ("EOD"), were not, *id*. ("We therefore hold that the EOD search violated Corrigan's rights under the Fourth Amendment."); *id*. at 1025 ("because no reasonable officer could have concluded such a basis [an exigency] existed for the second more intrusive search, the officers were not entitled to qualified immunity across the board"); *id*. at 1033 ("the extensive EOD search far exceeded the bounds of reasonableness").[2]

---

[2]  Although the panel was split on the question of whether the officers are entitled to qualified immunity, the panel was unanimous that the EOD search violated the Fourth Amendment. *See Corrigan*, 841 F.3d at 1039

As the plaintiff points out, the defendants "did not appeal this ruling." Pl.'s Reply Mem. Supp. Mot. Part. Summ. J. and Mot. in Limine ("Pl.'s Reply"), at 4, ECF No. 147. The D.C. Circuit remanded the plaintiff's claim of municipal liability against the District of Columbia, which is now moot in light of the plaintiff's voluntary dismissal of the municipality, *see* Pl.'s Opp'n Defs.' Supp. Mot. Summ. J. ("Pl.'s Opp'n"), at 1, ECF No. 134, and the issue of whether Ofc. Mark Leone is entitled to qualified immunity "because [he] reasonably relied on the directive of [his] superior," in conducting the EOD search, *Corrigan*, 841 F.3d at 1038.[3]

The trial in this matter is scheduled to begin on the date the parties jointly suggested, on July 10, 2017. *See* Consent Motion for New Trial Date (May 20, 2017), ECF No. 143; Minute Order (May 22, 2017) (granting motion and scheduling trial for July 10, 2017). Pending before the Court are (1) Ofc. Leone's supplemental motion for summary judgment, Def.'s Supp. Mot. Summ. J. ("Def.'s Supp. MSJ"), ECF No. 131; (2) the plaintiff's motion *in limine* or for partial summary judgment, Pl.'s Mot. In Limine or Partial Summ. J. ("Pl.'s Mot."), ECF No. 138; and (3) the defendants' motions *in limine, see* Defs.' Mot. In Limine, ECF No. 104; Defs.' Mot. In Limine, ECF No. 105, which motions were originally denied as moot in 2015, *see* Order, ECF No. 125, but, on remand, have been reinstated, at the defendants' request, Defs.' Notice of Filing Re: Mots. In Limine, at 1, ECF No. 137.

---

(Brown, J., dissenting) ("I agree with the conclusion that the second search of Corrigan's apartment violated the Fourth Amendment."); *id.* at 1040 (noting that "[u]nder the circumstances of this case, the first search was permissible; the second search was not; and the information the police garnered from the first search and further investigation changed the calculus. However, on the question of how these issues impact the scope of qualified immunity, we part company."); *id.* at 1041 n.1 ("I agree with the court's conclusion that the officers did violate Corrigan's Fourth Amendment rights during their second, intrusive search into his apartment.").

[3]    In response to this Court's Order to Show Cause ("OTSC") as to why former MPD Sergeant Pope, who led the ERT search, should not be dismissed as a defendant, *see* Order, dated April 12, 2017, the plaintiff contended that this defendant "authorized other police officers unrelated to the initial sweep to enter Mr. Corrigan's home," Pl.'s Resp. OTSC at 2, ECF No. 132, and, consequently, was "a proximate cause of the second search—a search the Court of Appeals recognized to have been patently unconstitutional," *id.* at 1, and to which "qualified immunity does not attach," *id.* at 4. Subsequently, however, the plaintiff voluntarily dismissed Sgt. Pope. *See* Minute Entry (May 17, 2017).

# I.   BACKGROUND

The background of this case has been fully summarized in prior decisions in this case, *see generally Corrigan v. District of Columbia*, 841 F.3d at 1025-28; *Corrigan v. District of Columbia*, 2015 WL 5031364, at *1–4, and, thus, only those facts necessary for resolving the instant motions are provided below.

On February 2, 2010, during a telephone call to the National Suicide Hotline, the plaintiff informed the hotline operator that he was a military veteran and owned firearms.  FAC ¶¶ 9.  "After a short conversation, [the plaintiff] hung up, turned off [his] phone, took prescribed sleeping medication, and went to bed."  *Id.*  The hotline operator then called 911, Defs.' Suppl. Statement of Material Facts as to which there is no Genuine Dispute in Further Supp. of Defs.' Mot. Summ. J. ("Defs.' Suppl. SMF") ¶ 1, ECF No. 119-1, and MPD officers were dispatched to the plaintiff's home based on a "report of an 'Attempted Suicide,'" Def. District of Columbia's Mot. Summ. J., Ex. 5 ("Barricade Report from 2408 N. Capitol St. NW (5D) on Wednesday, February 3, 2010 (ERT # 10–11), Feb. 9, 2010 ("Incident Rep.")) at 1, ECF No. 76-4.  After an odor of natural gas was detected, a barricade situation was declared and members of the MPD's ERT, part of the MPD's "Special Operations Division" ("SOD"), were dispatched to the scene. *Id.* at 1–2.

Around 2:30 A.M., approximately three-and-a-half hours after MPD officers first arrived on the scene, defendant Lt. Robert Glover arrived.  Incident Rep. at 2; Defs.' Suppl. SMF ¶ 3.  At approximately 4:00 A.M., the plaintiff awoke after hearing his name being called on a bullhorn and around 4:50 A.M. the plaintiff peacefully exited the apartment and was taken into police custody.  FAC ¶¶ 10–11.  The plaintiff did not give the MPD consent to enter his apartment, but Lt. Glover nonetheless ordered the ERT to immediately break into the apartment and conduct a

"sweep" of the apartment to determine whether any other individuals remained in the apartment. Def. Glover's Statement of Material Facts as to which there is no Genuine Dispute ("Glover SMF") ¶ 27, ECF No. 79; *see also* Pl.'s Response to Defendants' Statement of Material Facts ¶ 38, ECF No. 86-1. After no other individuals were found in the apartment, Lt. Glover ordered the EOD to enter and search the plaintiff's apartment for explosives or other hazardous materials. Glover SMF ¶ 32; *see also* Glover Dep. at 10:1–22 ("I directed the members of the [ERT] Entry Team to enter and search for any human threats that remained or victims. And I also directed members of the [EOD] to enter and check for any hazardous materials that could remain on the scene and be dangerous to the public or anybody else in that block or area.").

Ofc. Mark Leone conducted the EOD search. Pl.'s SMF, Ex. 5, Deposition of Officer Mark Leone ("Leone Dep."), at 19:7, ECF No. 87-1. Ofc. Leone was informed of a "barricade situation in reference somebody [sic] had a military background and that they were requesting that we cleared [sic] the apartment for any hazardous materials." *Id.* at 18:13–17. Before he conducted the search, Ofc. Leone had been told that ERT had already been in the apartment and that they had searched to "make sure there that there wasn't any other people in the apartment." *Id.* at 20:9–12. Thus, Ofc. Leone knew when he entered the apartment that no other people were inside. *Id.* at 20:13–15. Ofc. Leone "didn't know one way or another" if there was probable cause to believe that there were hazardous materials in the apartment. *Id.* at 21:21–22; *see also id.* at 101:11–15; 109:11–13. Nonetheless, Ofc. Leone then "performed a search on the apartment to clear for any booby traps or explosive devices, [or] hazardous materials." *Id.* at 19:1–4. This search was performed despite the fact that he had not been told that any MPD officer had seen explosives or that anyone heard that explosives were in the apartment. *Id.* at 22:2–7; *see also id.* at 101:16–21. Instead, he was merely advised that "due to the [plaintiff's]

military background [MPD] believed that the [sic] possibility of explosives could be in the apartment." *Id.* at 91:18–22.  During Ofc. Leone's search, he "cut open every zipped bag, dumped onto the floor the contents of every box and drawer, broke into locked boxes under the bed and in the closet, emptied shelves into piles in each room, and broke into locked boxes containing Corrigan's three firearms," *Corrigan*, 841 F.3d at 1028 (citing Pl.'s Answers to Interrogs., ¶ 8; FAC ¶ 22), resulting in the seizure from "[i]nside the locked boxes, . . . an assault rifle, two handguns, a military smoke grenade, a military "whistler" device, fireworks, and ammunition," *id*.

## II.    LEGAL STANDARD

### A.  Summary Judgment

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  The moving party bears the burden of demonstrating the "absence of a genuine issue of material fact" in dispute, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), while the nonmoving party must present specific facts supported by materials in the record that would be admissible at trial and that could enable a reasonable jury to find in its favor, *see Anderson v. Liberty Lobby, Inc*. ("*Liberty Lobby*"), 477 U.S. 242, 256 (1986); *Allen v. Johnson*, 795 F.3d 34, 38 (D.C. Cir. 2015) (noting that, on summary judgment, the appropriate inquiry is "whether, on the evidence so viewed, a reasonable jury could return a verdict for the nonmoving party" (internal quotation marks omitted)); *see also* FED. R. CIV. P. 56(c), (e)(2)–(3).  In making this evaluation, "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam), and "[t]he evidence of the nonmovant is to be believed,

and all justifiable inferences are to be drawn in his favor," *id.* at 1863 (quoting *Liberty Lobby*, 477 U.S. at 255 (alteration in original)).

### B. Motions *In Limine*

The Supreme Court has recognized that "[a]lthough the Federal Rules of Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States,* 469 U.S. 38, 41 n.4, (1984); *see id.* at 40 n.2 (defining motion *in limine* "in a broad sense to refer to any motion, whether made before or during trial, to exclude anticipated prejudicial evidence before the evidence is actually offered"). Indeed, Rule 103(d) of the Federal Rules of Evidence mandates that the court must conduct a jury trial to the extent practicable so that inadmissible evidence is not suggested to the jury by any means. FED. R. EVID. 103(d). Pretrial motions *in limine* are an important mechanism to effectuate this goal of insulating the jury from inadmissible evidence and further the purpose of the rules, generally, to administer the proceedings "fairly . . . to the end of ascertaining the truth and securing a just determination." FED. R. EVID. 102; *see Banks v. Vilsack,* 958 F. Supp. 2d 78, 82 (D.D.C. 2013) (citing FED. R. EVID. 103(d)). Moreover, "[a] pretrial ruling, if possible, may generally be the better practice, for it permits counsel to make the necessary strategic determinations." *United States v. Jackson*, 627 F.2d 1198, 1209 (D.C. Cir. 1980).

In evaluating the admissibility of proffered evidence on a pretrial motion *in limine* the court must assess whether the evidence is relevant and, if so, whether it is admissible, pursuant to Federal Rules of Evidence 401, 402 and 403. "[T]he burden is on the introducing party to establish relevancy," *Dowling v. United States*, 493 U.S. 342, 351 n. 3 (1990), as well as admissibility. Even relevant evidence may be deemed inadmissible and subject to exclusion on

multiple grounds, including that "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403. "Assessing the probative value of [the proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403." *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 384 (2008) (alteration in original) (quoting *United States v. Abel*, 469 U.S. 45, 54 (1984)).

Depending upon the nature of the evidentiary issue presented in a pretrial motion *in limine,* the court must also assess whether a ruling is appropriate in advance of trial or, instead, should be deferred until trial "'[when] decisions can be better informed by the context, foundation, and relevance of the contested evidence within the framework of the trial as a whole.'" *Herbert v. Architect of the Capitol*, 920 F.Supp.2d 33, 38 (D.D.C. 2013) (alteration in original) (quoting *Casares v. Bernal*, 790 F.Supp.2d 769, 775 (N.D. Ill. 2011)). The timing of a decision on the admissibility of contested evidence is a matter within a trial judge's discretion. *Banks,* 958 F. Supp. 2d at 81–82 (citing authorities); *Barnes v. District of Columbia*, 924 F. Supp. 2d 74, 78–79 (D.D.C. 2013) (citing authorities).

## III. DISCUSSION

The Court first addresses Ofc. Leone's motion for summary judgment on the explicit issue remanded by the D.C. Circuit: whether he is entitled to qualified immunity for following his superior's order to conduct the warrantless EOD search. Def.'s Mem. Supp. Summ. J. (Def.'s MSJ") at 5–8, ECF No. 131. Then the plaintiff's motion *in limine* and for partial summary judgment to exclude evidence, argument, or reference by defendants that the search of plaintiff's home was constitutional, Pl.'s Mem. Supp. Pl.'s Mot. at 1–2, is addressed, before

turning finally to the defendants' motions *in limine* seeking exclusion of argument or evidence relating to the plaintiff's arrest, incarceration, and prosecution in his underlying criminal proceedings.

## A. Ofc. Leone's Supplemental Motion for Summary Judgment

Ofc. Leone argues that he is entitled to qualified immunity because he relied on an order from Lt. Robert Glover. Def.'s MSJ at 5–6 ("Once Officer Leone arrived at the scene, based on the directive given to him by Lt. Glover, he joined other MPD officers already present in Plaintiff's apartment."). He posits that his conduct must be measured not by the reasonableness, or lack thereof, of the EOD search but by the reasonableness of him following the order of his superior officer. *Id.* at 7 (framing "the relevant question [as] whether an officer in this Defendants' position could have reasonably relied on the judgment of Lt. Glover" and urging that "[t]he facts here show such reasonable reliance"). Citing the "paramilitary" nature of the police department, Ofc. Leone argues he "was not in a position to disregard Lt. Glover's order which he believed to be lawful." *Id.*

At the outset, the factual record is murky regarding how Lt. Glover's order was communicated to Ofc. Leone. Although Lt. Glover testified that he directed the EOD to enter the apartment, Ofc. Leone, who actually conducted the EOD search, could not recall "who exactly" the order "came down from." Leone Dep. at 102:22–103:1. Instead, Ofc. Leone testified that he spoke with a colleague on the EOD, Officer William Powell, who "had spoken with higher ups" and "Officer Powell told [Leone] that he or [Leone] were supposed to go in and conduct a search." *Id.* at 103:4–8.[4] At oral argument on this motion, plaintiff's counsel indicated that he does not "have it in the record that [Leone] said Glover told him to go in."

---

[4]      On July 28, 2015, the plaintiff voluntarily dismissed Ofc. Powell as a defendant in this matter. *See* Joint Stipulation of Dismissal (July 28, 2015), ECF No. 118.

Motions Hearing (May 17, 2017). At the same time, in his supplemental responses to plaintiff's first set of interrogatories, Ofc. Leone stated that "[o]nce on the scene, I was advised by Lt. Glover that they needed the residence cleared on an EOD aspect due to the fact that the Plaintiff had a military background." Leone Mot. Summ. J., Ex 21, Leone Supp. Resp. Pl's 1st Set Interrogs., at 3, ECF No. 81-21. Thus, Ofc Leone has indicated both that he received the order from Lt. Glover and that he received the order from Ofc. Powell, who in turn received the order from unnamed superiors. In any event, no dispute exists that Lt. Glover gave the order for the EOD search and that Ofc. Leone executed that order, so any issue about precisely how that order was communicated to Ofc. Leone is immaterial and, therefore, does not require resolution at trial of a predicate factual issue before determination of whether qualified immunity applies.

The D.C. Circuit has expressly held that "the EOD search violated Corrigan's rights under the Fourth Amendment." *Corrigan*, 841 F.3d at 1035. Just because a search is found to violate the Fourth Amendment does not mean civil liability automatically attaches, however. Instead, when an officer "engages in constitutionally deficient conduct," qualified immunity provides a liability shield "if, in doing so, she did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Brosseau v. Haugen*, 543 U.S. 194, 205 (2004) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity 'gives government officials breathing room to make reasonable but mistaken judgments' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quoting *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2085 (2011)). Consequently, whether qualified immunity applies "'generally turns on the objective legal reasonableness of the [official's] action, assessed in light of the legal rules that were clearly established at the time.'" *Id.* at 546 (quoting *Anderson v. Creighton*, 483 U.S.

635, 639 (1987)).  In other words, while an officer's subjective state of mind is not relevant to

the qualified immunity inquiry, the officer's perceptions of the objective facts animating the

challenged conduct are.  *See White v. Pauly*, 137 S. Ct. 548, 550 (2017) (instructing that in

evaluating qualified immunity defense, "the Court considers only the facts that were knowable to

the defendant officers"); *Kingsley v. Hendrickso*n, 135 S. Ct. 2466, 2473 (2015) (noting that

determination of objective reasonableness must be made "from the perspective of a reasonable

officer on the scene, including what the officer knew at the time, not with the 20/20 vision of

hindsight") (internal quotations and citations omitted).

Mindful of these principles, Ofc. Leone's reliance on Lt. Glover's order for EOD to

search the plaintiff's apartment is not dispositive of whether Ofc. Leone is entitled to qualified

immunity since the "objective reasonableness" of his actions must be assessed based on what

was known to him at the time.  Indeed, the D.C. Circuit has emphasized that it "has never held

that qualified immunity permits an officer to escape liability for his unconstitutional conduct

simply by invoking the defense that he was 'just following orders.'"  *Wesby v. District of*

*Columbia*, 765 F.3d 13, 29 (D.C. Cir. 2014); *see also Messerschmidt*, 565 U.S. at 554–55 (2012)

(approval of a warrant by a magistrate, along with review by an officers' superior and deputy

district attorney, was "pertinent" but not "dispositive" as to whether an officer could have

reasonably believed that a warrant was supported by probable cause).  Two D.C. Circuit

decisions, *Elkins v. District of Columbia* and *Wesby v. District of Columbia*, instruct that an

officer's claimed entitlement to qualified immunity for following orders turns on a number of

different factors.  *See, e.g.*, *Elkins*, 690 F.3d 554, 569 (D.C. Cir. 2012) ("Whether an official's

reliance [on her supervisor] is reasonable will always turn on several factors . . . .").

In *Elkins*, the D.C. Circuit held that an inspector from the Historic Preservation Office ("HPO") was protected by qualified immunity for an unlawful seizure of the plaintiff's notebook. The inspector was just one among MPD officers, other HPO officials and personnel from the District of Columbia's Department of Consumer and Regulatory Affairs ("DCRA"), who participated in the search of the plaintiff's home. *Id.* at 568. After the search began, the inspector was asked to come inside and photograph the interior of the home. *Id.* When the inspector noticed other officials searching through drawers, she asked her supervisor whether that was permitted. *Id.* The supervisor "conferred with an MPD officer within earshot" of the inspector, and the officer stated that "anything related to construction, including documents, could be seized." *Id.* When the plaintiff produced the notebook, the inspector "took it from her." *Id.* The D.C. Circuit concluded that although the seizure was unlawful because it was outside the scope of the warrant, *id.* at 564, the inspector was entitled to qualified immunity, noting that the inspector was a "junior member of the search team," and she specifically asked her "superiors about the permissible scope of the search and relied upon the judgment of her supervisor and the police officer in charge," *id.* at 568. Although none of these factors were "dispositive," the D.C. Circuit held that "viewing them together," the inspector's actions, "though mistaken, were not unreasonable." *Id.*

In contrast to *Elkins*, the D.C. Circuit found the officers involved in the *Wesby* case not to be entitled to qualified immunity. In *Wesby*, the MPD dispatched officers to investigate a complaint of "illegal activities taking place at a house in Washington, D.C." *Wesby*, 765 F.3d at 17. Hearing loud music as they approached the house, the officers entered the home and saw acts consistent "with activity being conducted in strip clubs for profit." *Id.* After interviewing everyone present in the house and learning that a woman referred to as "Peaches" gave

permission to be in the house, the officers learned from speaking to Peaches via telephone, that she had told the individuals present the house that they could use it for a bachelor party but Peaches did not, in fact, have permission to use the house. *Id.* at 18. On that basis, "and notwithstanding the undisputed statements of both the guests and Peaches that she had given them permission to be at the house," the supervising sergeant ordered the other officers to arrest everyone for unlawful entry. *Id.*

The D.C. Circuit first concluded that the officers did not have probable cause to arrest the individuals for unlawful entry because "[a] reasonably prudent officer aware that the Plaintiffs gathered pursuant to an invitation from someone with apparent (if illusory) authority could not conclude that they had entered unlawfully." *Id.* at 21. The D.C. Circuit then assessed whether the officers were entitled to qualified immunity for following the orders of a superior officer. Comparing the officers' conduct to that of the housing inspector in *Elkins*, the D.C. Circuit concluded that the officers were not entitled to qualified immunity. Specifically, the D.C. Circuit observed that the officers at issue in *Wesby* were "police officers with the independent authority to make arrests while on patrol," and as such, "expected to know the limitations on their authority." *Wesby*, 765 F.3d at 28. The *Wesby* court also found it significant that unlike *Elkins*, the officers in *Wesby* were "actively involved in surveying the scene and gathering information regarding the Plaintiffs' knowledge and reason for being in the house" and "[b]oth officers . . . were aware of the key uncontroverted facts in th[e] case" that undermined the legality of the conduct. *Id.* at 28–29. Despite this awareness, neither officer raised any question about the legality of the order to arrest before they carried out the order. *Id.* at 29 (noting that another factor in *Elkins* but missing in *Wesby* was that the officers in *Wesby* never "raised the

question . . . whether there was evidence that the Plaintiffs knew or should have known that their presence in the house was unauthorized").

Elkins and Wesby illustrate that when determining whether an officer should be afforded qualified immunity for following orders, a fact-intensive and multi-factored inquiry is required. At least four factors may be distilled from Elkins and Wesby as relevant to this inquiry: (1) whether it would have been clear to a reasonable officer that the act in question was in violation of the Fourth Amendment; (2) whether the officer made any effort to obtain clarity about the legality of the search; (3) the experience of the officer, whose conduct is at issue; and (4) the officer's role in the investigation in terms of familiarity with the circumstances.

Ofc. Leone's conduct differs somewhat from that of the inspector in Elkins and the officers in Wesby, and presents a close call. Application of the factors drawn from Elkins and Wesby, however, show that Ofc. Leone's actions are closer to those of the officers in Wesby.

The first factor—whether it would have been clear to a reasonable officer that the act in question was in violation of the Fourth Amendment—is easily resolved by the D.C. Circuit's holding in this case that "no reasonable officer could have concluded . . . a basis existed for the second more intrusive search." Corrigan, 841 F.3d at 1025. Indeed, the D.C. Circuit's opinion is replete with references to the initiation and scope of the EOD search as "patent[ly] unreasonable[.]" Id. at 1036; see also id. at 1025 (noting that the "scope of the second search far exceeded what [the community caretaking] exception would allow"); id. ("[N]o reasonable officer could have concluded . . . a basis existed for the second more intrusive search[.]"); id. at 1029 ("At the very least, any search must be tailored to the exigent need, and the EOD's broad and vigorous search was unreasonable because it was not [so] tailored.") (internal quotation marks and citation omitted); id. at 1032 ("[T]he second warrantless break in of Corrigan's home

by the EOD was based on nothing more than a bare possibility, that he might have explosives that would ignite, a possibility the evidence shows was based on runaway speculation.") (internal quotation marks and citation omitted; alteration adopted); *id.* ("[T]he scope of the 'exhaustive and intrusive' search was unreasonably broad, with EOD officers rifling through every concealed space in Corrigan's home and breaking open closed containers."); *id.* ("Such a top-to-bottom search falls far outside the bounds of reasonableness given what the officers knew at the time and the Supreme Court's clear admonition that warrantless searches pursuant to an exigent circumstances exception be strictly circumscribed by the exigencies which justify its initiation.") (internal quotation marks and citation omitted). Indeed, the D.C. Court underscored that "[n]o precedent, even in the context of potentially explosive devices, supports the officers tearing open containers and prying open locked boxes when conducting a warrantless search based on conjecture that hazardous substances might be present." *Id.* This Court is bound by this conclusion of law and, thus, the first factor weighs heavily against the grant of qualified immunity to Ofc. Leone.

Second, Ofc. Leone made no apparent effort to clarify the legal basis for the search to assure himself that the search was permissible. To the contrary, as the plaintiff notes, Ofc. Leone testified that no one actually told him they had seen explosives in the apartment or heard that such incendiary material was present. Pl.'s SMF ¶ 181; Leone Dep. at 101:16-21. Further, Ofc. Leone also testified that he did not have probable cause to believe that there were explosive devices in the apartment. Leone Dep. at 101:11-15. Instead, Ofc. Leone was aware that other officers had been at the location for some time and that ERT's sweep had already found that no person was present in the apartment. Leone Dep. at 20:9–12. He was merely advised that "due to the subject's military background they believed that the [sic] possibility of explosives could be

in the apartment." *Id.* at 91:19–22; 101:22. Thus, Ofc. Leone lacked any information whatsoever that would have given him minimal comfort that the search was legally permissible and he made no effort to ask basic questions to determine whether probable cause or an exigency existed to conduct an extensive search of the apartment. In fact, Ofc. Leone testified that he did not do "anything to second guess the officers already on the scene" with respect to the "determination of probable cause." *Id.* at 92:9–12. Ofc. Leone appears to have "blindly follow[ed] . . . orders," *Wesby*, 765 F.3d at 28, and proceeded to conduct "'an exhaustive and intrusive search,'" *Corrigan*, 841 F.3d at 1036 (quoting *Mincey v. Arizona*, 437 U.S. 385, 389 (1978)), without assuring himself of a minimal understanding of its legal basis. This factor, too, weighs against the granting of qualified immunity to Ofc. Leone.

Third, although Ofc. Leone was a "rookie tech," *see* Leone Dep. at 103:11, like the officers involved in *Wesby*, he is a law enforcement officer who is expected to be trained in the limits of his authority, *see Wesby*, 765 F.3d at 28 ("Police officers charged with enforcing the criminal statutes are expected to know the limitations on their authority . . . ."); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982) ("Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action."). As an EOD member, in particular, he is focused on dealing with explosives and hazardous materials, which as the D.C. Circuit pointed out, means that "the purpose of the EOD search cannot be characterized as altogether divorced from 'the detection, investigation, or acquisition of evidence relating to' a crime," and "[b]ased on their own statements, the officers acted not solely to ensure public safety as community caretakers, but to investigate whether Corrigan had left explosive or hazardous materials set to explode — activity that would have been criminal." *Corrigan*, 841

F.3d at 1034-35. Moreover, given the D.C. Circuit's conclusion that the second search was "patently unreasonable[], both in terms of its scope and the lack of a reasonable basis for it," *Corrigan*, 841 F.3d at 1036, "a reasonably competent officer faced with the information the officers had gathered in this case should have known that he lacked" a legal basis to perform the intrusive second search, *Wesby*, 765 F.3d at 28. This factor, albeit mixed, weighs against the granting of qualified immunity.

Finally, Ofc. Leone's role in the investigation was limited but not insignificant. The defendants argue Ofc. Leone is unlike the officers in *Wesby*, who were denied qualified immunity, because unlike those officers, Ofc. Leone was not the "hub of the investigation." Defs.' Reply Supp. Defs.' MSJ, at 3, ECF No. 135 (quoting *Wesby*, 765 F.3d at 262). The defendants note that the officers in *Wesby* "gathered evidence" and "actively participated in questioning the Plaintiffs and other key witnesses" before the arrest that was deemed unlawful. *Id.* (quoting *Wesby*, 765 F.3d at 262). To be sure, Ofc. Leone's role is more limited than that of the officers in *Wesby*. That said, Ofc. Leone was responsible for conducting the entirety of the second EOD search, Leone Dep. at 19:7, a search which, according to the D.C. Circuit, "far exceeded the bounds of reasonableness," *Corrigan,* 841 F. 3d 1033. Indeed, aside from Lt. Glover, who ordered the EOD search, Ofc. Leone appears to be the only other individual who played any role in the search.[5] Further, Ofc. Leone had sufficient familiarity with the circumstances of the ERT search to know that a sweep of the premises had already occurred, with no further exigency at stake. By the time he conducted his own search, Ofc. Leone had been informed that ERT had already been in the apartment and that officers had "ma[d]e sure there that there wasn't any other people in the apartment." Leone Dep. at 20:9–12. Thus,

---

[5]     Although Officer Powell, another member of the EOD, was also on the scene, Ofc. Leone testified that Powell did not actually go into the apartment. *See* Leone Dep. at 92:13–18.

although Ofc. Leone arrived late on the scene and had the limited role of eliminating explosive or other hazardous materials from the apartment, he had been apprised of sufficient information undermining the legality of the warrantless search and nonetheless then conducted the extensive search found to be a clear violation of the Fourth Amendment by the D.C. Circuit.

In considering these factors, the Court is mindful of the Supreme Court's recent decision in *White v. Pauly*, 137 S. Ct. 548, 550 (2017), reversing the Tenth Circuit's denial of qualified immunity on an excessive force claim to a police officer, who arrived late to an armed confrontation involving other officers and witnessed one of two armed men inside a house fire two shotgun blasts, prompting the officer to make a "quick choice to use deadly force," by shooting and killing the man firing the shotgun, without giving a warning to drop his weapon. The Supreme Court concluded that in these particular "circumstances," "[c]learly established federal law does not prohibit a reasonable officer who arrives late to an ongoing police action . . . from assuming that proper procedures . . . have already been followed," and that "[n]o settled Fourth Amendment principle requires that officer to second-guess the earlier steps already taken by his or her fellow officers." *Id.* at 552. While Ofc. Leone was also "late to an ongoing police action," and was not required "to second-guess the earlier steps taken" by fellow officers, the holding in *White* is expressly limited to the "unique set of facts and circumstances" presented in the case, which involved the imminent threat of deadly force, *id.* (emphasizing that clearly established law did not prohibit the officer's acts in the particular "circumstances" and "instances like the one [the officer] confronted here"). Moreover, the *White* Court "reiterate[d] the longstanding principle" in qualified immunity cases that "clearly established law should not be defined at a high level of generality," "must be 'particularized' to the facts of the case," and must give "fair and clear warning" to officers that their conduct is unlawful under the Fourth

Amendment.  *Id.*  The binding D.C. Circuit decision in this case that clearly established law rendered the EOD search "patently unreasonable," based on the information available to the officers, including Ofc. Leone, plainly distinguishes *White.*

In sum, after weighing all four factors, Ofc. Leone has not shown that his reliance on the order of Lt. Glover was objectively reasonable under these circumstances to entitle him to qualified immunity based on following an order to conduct a warrantless search.  Accordingly, Ofc. Leone's motion for summary judgment is denied.

### B.  The Plaintiff's Motion *in limine* and for Partial Summary Judgment

On May 12, 2017, the plaintiff filed a motion *in limine* to preclude defendants from arguing at trial that their search of the plaintiff's apartment was constitutional, or alternatively, for partial summary judgment on the remaining defendants' liability, in light of the D.C. Circuit's holding that the search "has now been held unconstitutional as a matter of law."  Pl.'s Mem. Supp. Mot. In Limine or Partial Summ. J., at 1 ("Pl.'s Mem."), ECF No. 138-1.  Indeed, the D.C. Circuit explicitly held that the MPD's second search, by EOD, violated the plaintiff's Fourth Amendment rights.  *Corrigan*, 841 F.3d at 1039.  As this issue is now law of the case, partial summary judgment is warranted and the defendants may not argue that the EOD search comported with the Fourth Amendment.

Under the mandate rule, this Court is bound by the holding of the D.C. Circuit.  *See Indep. Petroleum Ass'n of Am. v. Babbitt*, 235 F.3d 588, 596–97 (D.C. Cir. 2001) ("Under the mandate rule, 'an inferior court has no power or authority to deviate from the mandate issued by an appellate court.'" (quoting *Briggs v. Pa. R.R. Co.*, 334 U.S. 304, 306 (1948)).  "The mandate rule is a 'more powerful version' of the law-of-the-case doctrine, which prevents courts from reconsidering issues that have already been decided in the same case."  *Id.* at 597 (citations

omitted). "Unlike the doctrine of *res judicata,* however, the 'law of the case' doctrine does not seek to sweep under its coverage all possible issues arising out of the facts of the case." *U.S. on Behalf of Dep't of Labor v. Ins. Co. of N. Am. ("ICNA")*, 131 F.3d 1037, 1041 (D.C. Cir. 1997). "Rather, the scope of the 'law of the case' doctrine is limited to issues that were decided either explicitly or by necessary implication—'[t]he mere fact that [an issue] could have been decided is not sufficient to foreclose the issue on remand.'" *Id.* (quoting *Maggard v. O'Connell*, 703 F.2d 1284, 1289 (D.C. Cir. 1983)). "[I]t is entirely appropriate—and, in most cases in this circuit, necessary—to consult the opinion to interpret the mandate." *Id.* at 1041 n.7; *see also United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 865 F. Supp. 2d 1, 6 (D.D.C. 2011) ("When a district court is considering proceedings on remand, a circuit court's opinion 'may be consulted to ascertain what was intended by its mandate.'" (quoting *In re Sanford Fork & Tool Co.*, 160 U.S. 247, 256 (1895)).

Review of the D.C. Circuit's opinion makes clear that the D.C. Circuit held that "the MPD's second search, by the EOD, violated [the plaintiff's] Fourth Amendment rights." *Corrigan*, 841 F.3d at 1039. The D.C. Circuit expressed this holding repeatedly and with unambiguous language. *See id.* at 1025 ("Because it was (and is) clearly established that law enforcement officers must have an objectively reasonable basis for believing an exigency justifies a warrantless search of a home, and because no reasonable officer could have concluded such a basis existed for the second more intrusive search, the officers were not entitled to qualified immunity across the board."); *id.* at 1036 ("The unfocused nature of the EOD search underscores its patent unreasonableness, both in terms of its scope and the lack of a reasonable basis for it."); *id.* ("[N]o reasonable officer could have believed that an exigency continued to

exist as would justify a second warrantless break in of Corrigan's home to search for explosives.").

The defendants suggest that this interpretation of the D.C. Circuit's decision is "too broad, and is inaccurate." Defs.' Opp'n Pl.'s Mot. In Limine or Partial Summ. J. ("Def.'s Opp'n"), at 8, ECF No. 145. Although acknowledging that the D.C. Circuit held that the second EOD search was unconstitutional, the defendants aver that in reaching this conclusion, the D.C. Circuit was viewing the issue through the lens of the defendants' motion for summary judgment. *See* Defs.' Opp'n at 9. According to the defendants, "[w]hether the defendants were entitled to summary judgment—the issue in the appeal—is a different issue than whether the plaintiffs are entitled to summary judgment." *Id.*[6] At first blush, the defendants' argument is plausible, but in the context of the D.C. Circuit's opinion and mandate here, is not persuasive. When, for example, a Court of Appeals reverses a grant of summary judgment by finding genuine disputes as to material facts, remand to the district court effectively "restarts" the litigation in the district court. In *Johnson v. District of Columbia*, 528 F.3d 969 (D.C. Cir. 2008), for example, the D.C. Circuit concluded that granting summary judgment on the basis of qualified immunity was "premature" because there was a "genuine issue of material fact" that precluded summary

---

[6]   The defendants reliance on *United States ex rel. DOL v. Ins. Co. of N. Am.* ("*DOL*"), 131 F.3d 1037 (D.C. Cir. 1997), for this proposition is misplaced since that case did not address the effect of the summary judgment standard on the scope of the mandate but rather the occasional difficulty presented in discerning the scope of an ambiguous mandate. In *DOL,* the D.C. Circuit construed the defendant's obligation to pay covered claims under indemnity bonds obtained by a coal mine operator to fulfill its self-insurance responsibilities under the Black Lung Benefits Act. *Id.* The D.C. Circuit held that, according to the bond's language, the defendant "was liable only for those claims that *accrued* during the bond period, rejecting the district court's conclusion that [the defendant] was liable for all claims *outstanding* during the bond period." *Id.* On remand, the district court interpreted the mandate to hold that a miner's last year of employment with the coal mine operator, rather than his or her first year, had to fall within the bond period for the claim to "accrue" during the bond period. *Id.* On appeal for the second time, the D.C. Circuit held that the previous opinion "did not address the issue of which year should be considered to mark the accrual point" and therefore vacated the district court's judgment and remanded for a second time for the district court to decide "the trigger year intended by the parties to the bond agreement." *Id.* This case, then, simply stands for the proposition that a district court can misinterpret the mandate of the Court of Appeals. If the D.C. Circuit's opinion here were in any way ambiguous as to the constitutionality of the search, *DOL* might be useful precedent. As the D.C. Circuit unambiguously held that the EOD search was unconstitutional, however, *DOL* is of little help.

judgment. *Id.* at 977–78. Although the district court's finding of qualified immunity was

reversed, the D.C. Circuit cautioned that the plaintiff was "not home free," because "[h]is victory

on appeal c[a]me[] from our having viewed the facts most favorably to him." *Id.* at 978; *see also*

*DeGraff v. District of Columbia*, 120 F.3d 298, 302 (D.C. Cir. 1997) (reversing district court's

grant of summary judgment in favor of district and officers on claims that these defendants

violated the Fourth Amendment, concluding that insufficient facts were in the record to

determine whether officers were entitled to qualified immunity); *Edwards v. Shanley*, 666 F.3d

1289, 1295 & n.3 (11th Cir. 2012) (reversing grant of summary judgment on qualified immunity

grounds at the summary judgment stage in light of clear factual dispute between the parties

whether the police dog bite lasted between five to seven minutes, as the plaintiff claimed, or

fifteen to twenty seconds, as the officers claimed, but stressing that conclusion regarding

violation of "clearly established federal law" was premised on accepting plaintiff's account and

"that a jury would be free to make its own fact findings"); *Rodriguez v. Passinault*, 637 F.3d 675,

687 (6th Cir. 2011) (reversing district court's grant of summary judgment on qualified immunity

grounds after finding that a genuine issue of material fact existed requiring remand); *Fils v. City*

*of Aventura*, 647 F.3d 1272, 1292 & n.24 (11th Cir. 2011) (affirming district court's denial of

motions for summary judgment based on qualified immunity, but noting that the conclusion was

"driven by the stark contrast between [the plaintiff's] version of events and that of Defendants"

and that "[a]t summary judgment, [the court had to] accept [the plaintiff's] version of events, and

make all reasonable inferences in his favor."); *Howard v. Kansas City Police Department*, 570

F.3d 984, 992 n.8, 997 (8th Cir. 2009) (affirming denial of summary judgment based on qualified

immunity to two police officers accused of forcing a shirtless shooting victim onto hot asphalt

street, resulting in second degree burns, due to "stark factual scenario posited by" plaintiff,

whose version of events was accepted over the officers' contrary version at summary judgment stage, and remanding for trial).[7]  As these cases illustrate, when reversal of grants of summary judgment (or affirmations of denials of summary judgment) to police officers asserting qualified immunity are premised on disputed material facts, the appellate decisions will not result in binding law of the case.  Instead, on remand, the factfinder must determine the "actual" facts of the case in order for the Court to assess whether those facts establish immunity from suit precluding civil liability.

Not all mandates are so limited, however.  The Court of Appeals may, in addition to reversing a grant of summary judgment, reach legal conclusions governing the continuing litigation on remand.  The Court of Appeals might conclude that certain facts—irrespective of making any factual inferences in either party's favor—establish liability, which conclusions of law may not be disregarded by the district court.  *See Babbitt*, 235 F.3d at 596–97.

For example, in *Guzman v. City of Chicago*, a case from the Northern District of Illinois, police officers "stormed the apartment" of the plaintiff, "gestured for her to lie down on the floor and searched her apartment," but unfortunately "searched the wrong apartment."  *Guzman v. City of Chicago*, Civil No. 05-6617, Dkt. No. 191 ("*Guzman* Summ. J. Order") (N.D. Ill. Feb. 25, 2010).  In the plaintiff's subsequent suit against the City of Chicago and two police officers under § 1983 for, among other things, illegal search and false arrest, the Seventh Circuit reversed the district court's grant of summary judgment to the defendants on those two counts, concluding that "there is no question that the search was illegal."  *Guzman v. City of Chicago*, 565 F.3d 393,

---

[7]       On remand, in the *Howard v. Kansas City Police Department* and *Edwards v. Shanley* cases, juries ultimately found for the defendant officers.  *See Howard v. Kansas City Police Dep't*, Civil No. 06-00628 (DW), Dkt. No. 111 (W.D. Mo. July 27, 2010); *Edwards v. Shanley*, Civil No. 10-554 (GKS-DAB), Dkt. No. 79 (M.D. Fla. Mar. 5, 2003).  The remaining cases all settled on remand.  *See Johnson v. District of Columbia*, Civil No. 02-1452 (RMC), Dkt. No. 56 (D.D.C. Nov. 12, 2008); *DeGraff v. District of Columbia*, Civil No. 94-1949 (JLG), Dkt. No. 177 (D.D.C. Sept. 18, 1998); *Rodriguez v. Passinault*, Civil No. 07-14537 (LPZ-MKM), Dkt. No. 41 (E.D. Mich. Feb. 28, 2012); *Fils v. City of Aventura*, Civil No. 05-22308 (WMH), Dkt. No. 264 (S.D. Fla. Nov. 14, 2011).

399 (7th Cir. 2009). On remand, the plaintiff moved for partial summary judgment on her illegal search and false arrest claims based on the Seventh Circuit's conclusion "that the search was illegal." *Guzman* Summ. J. Order. Recognizing that the Seventh Circuit's "conclusion that the search was illegal could not have been more explicit" and was law of the case, the district court granted partial summary judgment on liability and proceeded to trial on damages. *Id.*; *see also Guzman v. City of Chicago ("Guzman II")*, 689 F.3d 740, 742 (7th Cir. 2012) (explaining the procedural history of the case).

Likewise, here, the D.C. Circuit reversed the grant of summary judgment, finding that, based on existing precedent and the undisputed facts in the record, the second warrantless search by EOD was unconstitutional. *Corrigan*, 841 F.3d at 1032 (explaining that "binding precedents resolve[d] the Fourth Amendment issue").[8] To be sure, the D.C. Circuit references the summary judgment standard. *See id.* at 1029 (noting that appellate court "like the district court, [must] examine the facts in the record and all reasonable inferences derived therefrom in a light most favorable to the nonmoving party." (citations and internal quotes omitted; alteration in original)); *id.* at 1035 ("Consequently, upon viewing the evidence in the light most favorable to Corrigan as the non-movant, we conclude that the officers fail to demonstrate that the extensive EOD search of Corrigan's home was justified by any plausible exigency." (citation omitted)). Nevertheless, the D.C. Circuit did not reach its holding on the Fourth Amendment violation by finding disputed material facts or colored by any inferences drawn in the light most favorable to the plaintiff. To the contrary, the D.C. Circuit concluded, based on the undisputed facts in the

---

[8]        The mandate from the D.C. Circuit in this case states: "This cause came on to be heard on the record on appeal from the United States District Court for the District of Columbia and was argued by counsel. On consideration thereof, it is **ORDERED** and **ADJUDGED** that the judgment of the District Court appealed from in this cause be reversed as to the grant of summary judgment on Corrigan's Fourth Amendment claim, be reversed in part as to the officers' qualified immunity defenses, and the case be remanded for further proceedings, in accordance with the opinion of the court filed herein this date."

record, that the second EOD search was a violation of the Fourth Amendment as a matter of law. This legal determination is binding on this Court.

In particular, the D.C. Circuit rejected the justification of exigent circumstances for the EOD search, explaining first that, "the officers had no reasonable basis for believing that imminently dangerous 'hazardous materials,' like an explosive device, were in Corrigan's home" and after the ERT search had been conducted, the officers knew that no one was inside the home. *Corrigan*, 841 F.3d at 1031. Thus, "the claimed basis for believing exigent circumstances existed had abated." *Id.* Second, "the officers' own delay during the hours-long barricade belie[d] the notion that another *immediate* break in was reasonable, much less urgently needed." *Id.* at 1032. Third, the D.C. Circuit concluded that the "scope of the 'exhaustive and intrusive' search was unreasonably broad, with EOD officers rifling through every concealed space in [the plaintiff's] home and breaking open closed containers." *Id.* The Circuit held that "[s]uch a top-to-bottom search falls far outside the bounds of reasonableness given what the officers knew at the time and the Supreme Court's clear admonition that warrantless searches pursuant to an exigent circumstances exception be 'strictly circumscribed by the exigencies which justify its initiation.'" *Id.* (quoting *Mincey*, 437 U.S. at 393). For these reasons, the D.C. Circuit concluded that exigent circumstances no longer existed for the EOD search, which was also unreasonably broad. Accordingly, the D.C. Circuit held that "[c]learly established law foreclosed the broad and invasive search that was executed." *Id.* at 1036. Unlike a reversal of a grant of summary judgment that is premised on identified disputed material facts, the D.C. Circuit's reversal in this case was specifically based on a conclusion of law.

Despite this clear holding, the defendants enumerate a dozen facts which they contend warrant presentation to a jury to consider in evaluating the reasonableness of the ERT and EOD

searches, including that: (1) the plaintiff "started the chain of events" by calling the National Suicide Hotline; (2) the National Suicide Hotline was "concerned about the exchange with" the plaintiff and called "the District and alerted its concern that Plaintiff was suicidal"; (3) the District "was notified that Plaintiff had a gun and wants to kill himself"; (4) the hotline operator warned that the plaintiff had "severe PTSD symptoms," with a loaded gun "actually on his lap"; (5) the plaintiff lied to the police about his whereabouts when he was first contacted by telephone and "when he left his apartment, locked it as if he had something to hide"; (6) Lt. Glover was told the plaintiff served in the U.S. Army and was an expert in improvised explosive devices; (7) Lt. Glover was told the plaintiff's apartment was serviced by a gas line; (8) Lt. Glover "could not confirm whether or not the reported gas leak was resolved because Plaintiff lived in a basement apartment where the gas could have been heavier"; (9) Lt. Glover "considered the current state of Plaintiff's mental health before he ordered [EOD] to search Plaintiff's apartment"; (10) defendant Glover "believed exigent circumstances still existed and directed members of the EOD to enter and search Plaintiff's apartment for explosives because of 'the potential threat to the community at large, those that still remained on the scene, and anyone who would come after we departed the scene' to encounter any hazardous materials or devices"; (11) "Officer Leone had less seniority than Officer William Powell and therefore he went into Plaintiff's apartment based on Defendant Glover's call for EOD to search for explosives within the apartment";[9] and (12) the plaintiff was taken to a VA hospital and "admitted himself because he knew he needed treatment." Defs.' Opp'n at 9–11.[10]

---

[9] Ofc. Leone's low seniority may be relevant to his entitlement to qualified immunity, but is immaterial to whether the search itself was unconstitutional. *See, e.g.*, *Mitchell v. Forsyth*, 472 U.S. 511, 527–28 (1985) (a determination of qualified immunity is "conceptually distinct from the merits of the plaintiff's claim that his rights have been violated").

[10] The defendants provide no citations for the third or fourth factual assertions regarding what the hotline operator told the District about the plaintiff, including his alleged possession of a gun and desire to commit suicide.

The D.C. Circuit, however, considered most of these facts in finding the EOD search violative of the Fourth Amendment. As the D.C. Circuit observed: "The evidence shows only that the MPD officers were presented with a potentially suicidal military veteran who possessed 'military items' and had IED training, but no information about actual or reported threats by him to others, much less that he had IED materials at home or would commit suicide in a manner that threatened others." *Corrigan*, 841 F.3d at 1036. Further, the D.C. Circuit found that "[n]umerous witnesses, including Officer Leone who led the EOD search, confirmed that if there was ever a gas smell, it had dissipated well before either search," noting that "[t]he gas to the row house had been turned off upon MPD's arrival, and no one reported smelling gas in the hours leading up to the EOD search, or during the ERT 'sweep.'" *Id.* at 1038. Finally, the D.C. Circuit noted that Ofc. Leone "had not even been told of any concern about gas when he entered Corrigan's home." *Id.* (citing Leone Dep. 60:2–4). Thus, the facts the defendants deem relevant to the determination of whether the second search was constitutional were considered, but were found by the D.C. Circuit to be patently insufficient to justify the second "exhaustive and intrusive" search. As the Court explained, "[t]o reasonably conclude a second break in of Corrigan's home was necessary to resolve an imminently dangerous situation, the officers would have had to engage in conjecture that [the plaintiff], in his suicidal state, had intentionally set and hidden an explosive device in his home, or that he possessed an explosive device that he stored so negligently as to pose an imminent threat." *Id.* Concluding that the officers would have had to "overcome the inferential chasm between the circumstances presented to the officers and the explosive consequences that the officers might have feared," the D.C. Circuit found that the

---

In any event, these facts, even if proven, would not affect the analysis of the EOD search, which occurred after the plaintiff had already peacefully surrendered to police custody.

officers "engaged in raw speculation unsupported by either precedent or the information they had." *Id.*

In any event, the defendants fail to explain how these facts, even if viewed in a light most favorable to them, would lead to a different conclusion. Nor can they do so. The D.C. Circuit held that the undisputed facts in the record led to the conclusion that, as a matter of law, the second search by EOD violated the plaintiff's Fourth Amendment rights. The defendants chose not to appeal this ruling and, thus, it is now law of the case binding on this Court. *See Crocker v. Piedmond Aviation, Inc.*, 49 F.3d 735, 739 (D.C. Cir. 1995) (when the Court of Appeals "affirmatively decide[s an] issue, be it explicitly or by necessary implication," that holding becomes law of the case).

This does not entirely resolve the best path forward. The plaintiff argues that "Defendants Glover and Leone are bound by the D.C. Circuit's determination that Defendants violated Plaintiff's Fourth Amendment rights, and thus, the trial should proceed exclusively on the issue of damages." Pl.'s Supp. Br. Supp. Pl.'s Opp'n Defs.' Mot. in Limine ("Pl.'s Supp. Opp'n."), at 2, ECF No. 144. This was the general approach taken by the *Guzman* district court. The *Guzman* district court, however, made errors that must be avoided, including by allowing the defendants to present "evidence and arguments tending to disclaim their liability" and "that the defendants' entire theory of the case was that the search and seizure were legal and reasonable, and that if [the plaintiff] suffered harm it was caused by" other officers not named as defendants. *Id.* at 746. The plaintiff was ultimately awarded one dollar in damages. *Id.* at 742. On appeal, the Seventh Circuit held, among other things, that the "defendants' theory of the case, the evidence they introduced, and the liability instruction likely confused the jury." *Id.; id.* at 747 ("the defense's theory and evidence, coupled with the liability instruction, likely confused the

jury by converting this damages-only trial into one about liability").  The Seventh Circuit

explained that in a damages-only trial, only "three issues need to be resolved: what injuries did

[the plaintiff] sustain, were they proximately caused by the unlawful search and seizure, and

what amount of damages would reasonably and fairly compensate her for those injuries."  *Id.* at

745–46 (citing *Herzog v. Vill. of Winnetka,* 309 F.3d 1041, 1044 (7th Cir. 2002) ("[T]he ordinary

rules of tort causation apply to constitutional tort suits."); *Henderson v. Sheahan,* 196 F.3d 839,

848 (7th Cir. 1999) ("[A] plaintiff must demonstrate both that he has suffered an 'actual' present

injury and that there is a causal connection between that injury and the deprivation of a

constitutionally protected right caused by a defendant.")).  Thus, the Seventh Circuit explained

that "the question should have been whether [the plaintiff's] injuries were proximately caused by

the unlawful search and seizure."  *Id.* at 747–48 (citing *Carey,* 435 U.S. at 264 ("[T]he basic

purpose of a § 1983 damages award should be to compensate persons for injuries caused by the

deprivation of constitutional rights."); *Herzog v. Vill. of Winnetka,* 309 F.3d 1041, 1044 (7th Cir.

2002) ("[W]hen an illegal arrest sets off a chain of indignities . . . [the victim] is entitled to

obtain damages for these indignities . . . [f]or they are foreseeable consequences of the illegal

arrest, and the ordinary rules of tort causation apply to constitutional tort suits.")).

    This case differs from *Guzman,* where only a single unconstitutional search was at issue,

in that the D.C. Circuit has held here that officers were entitled to qualified immunity from

claims arising out of the first ERT search, whereas officers were not entitled to qualified

immunity from claims arising out of the second EOD search.  *See Corrigan*, 841 F.3d at 1035.

As a result, in this case, determining whether the plaintiff's alleged injuries "were proximately

caused by the *unlawful* search and seizure" might turn on which search, by ERT or EOD,

proximately caused those injuries.  For this reason, the Court will take certain steps to ensure that

this remains a "damages-only trial" with respect to the EOD search, while permitting defendants to provide the full context of the two searches so that the jury can decide which injuries, if any, were proximately caused by the EOD search. First, because the plaintiff is correct that the law of the case precludes argument that the *second* search by EOD was constitutional, the plaintiff is entitled to an instruction from the Court that the second search by EOD was a violation of the plaintiff's Fourth Amendment rights. Second, because argument regarding the constitutionality of the EOD search is no longer "of consequence in determining the action," such argument is irrelevant under Rule 401 of the Federal Rules of Evidence. FED. R. EVID. 401. Third, because the jury will be charged with determining whether the plaintiff's injuries were proximately caused by the second search, defendants will not be precluded from presenting evidence regarding the circumstances of both the ERT and EOD searches in order to provide the jury with the full context of the incident for purposes of assessing damages. As the Supreme Court has made clear, "§ 1983 creates a species of tort liability," *Heck v. Humphrey,* 512 U.S. 477, 483 (1994), and "the rules governing compensation for injuries caused by the deprivation of constitutional rights should be tailored to the interests protected by the particular right in question." *Carey*, 435 U.S. at 258–59; *see also Hector v. Watt*, 235 F.3d 154, 157 (3d Cir. 2000) ("Victims of unreasonable searches or seizures may recover damages directly related to the invasion of their privacy . . . ."). Accordingly, in order to give the jury the necessary context of the damages caused by the *second* unconstitutional search so that damages may be properly tailored to that particular violation of the plaintiff's constitutional rights, defendants are free to present evidence regarding the circumstances of both searches.

For these reasons, the plaintiff's motion for partial summary judgment as to the unconstitutionality of the second search by EOD is granted. Moreover, the defendants may not

argue that the EOD search of the plaintiff's home was constitutional.[11]  The defendants may, however, present evidence regarding the full circumstances of the ERT and EOD searches so that the jury may accurately determine whether and which damages are proximately caused by the second EOD search.

### C.  The Defendants' Motions *In Limine*

The defendants move *in limine* to exclude all evidence or argument regarding (1) the plaintiff's arrest and/or the alleged unlawfulness of his arrest; (2) that he was criminally prosecuted; (3) the disposition of those charges; and (4) damages which stem from the arrest, prosecution, or incarceration.  *See* Defs.' Mot. *In Limine*, ECF No. 104; Defs.' Mot *In Limine*, ECF No. 105.  The defendants further argue that the plaintiff should be precluded from introducing at trial that some of his guns and ammunition were returned to him by court order. *See* Defs.' Mot. *In Limine*, ECF No. 104.  Each of these arguments are addressed in turn.

### 1. The Admissibility of Arguments or Evidence Regarding the Plaintiff's Arrest, Incarceration, or Prosecution

The defendants assert that any argument or evidence with respect to the plaintiff's arrest, prosecution, or incarceration is irrelevant to his sole claim against defendants for unlawful search and seizure.  In response, the plaintiff argues that the evidence is relevant to the damages the plaintiff seeks for his arrest, prosecution, and incarceration "that flow directly from the Defendants' violation of his Fourth Amendment privacy liberty interests."  Pl.'s Supp. Opp'n Defs.' Mots. *In Limine* ("Pl.'s Supp. Opp'n"), at 2, ECF No. 144.  In the plaintiff's view, the

---

[11]    The plaintiff moved *in limine* for an order to "exclude any evidence, argument, or reference concerning evidence Defendants recovered in their unconstitutional search of Plaintiff's home."  Pl.'s Mot. at 9.  In his reply, however, the plaintiff "agree[d] with Defendants that evidence the Defendants secured from" the search of the plaintiff's home "is relevant to the issue of damages at trial."  Pl.'s Reply Supp. Pl.'s Mot., at 5, ECF No. 147.  Accordingly, the plaintiff's motion *in limine* is denied.  The defendants may present evidence of the items recovered during the search, including "an assault rifle, two handguns, a military smoke grenade, a military 'whistler' device, fireworks, and ammunition."  *Corrigan*, 841 F.3d at 1028.

unlawful arrest and prosecution of the plaintiff was a "direct consequence" of the search of the plaintiff's apartment which has now been held to be unlawful by the D.C. Circuit. *Id.* at 2–3.

The Supreme Court has instructed that in the context of § 1983, "the rules governing compensation for injuries caused by the deprivation of constitutional rights should be tailored to the interests protected by the particular right in question." *Carey v. Piphus*, 435 U.S. 247, 258–59 (1978). "[T]he elements and prerequisites for recovery of damages appropriate to compensate injuries caused by the deprivation of one constitutional right are not necessarily appropriate to compensate injuries caused by the deprivation of another." *Id.* at 264–65. For this reason, courts have often held that plaintiffs pleading a violation of unlawful search and seizure may not necessarily seek damages for subsequent prosecution, conviction, or incarceration premised on that search and seizure absent a claim for false arrest or malicious prosecution.

For example, in *Townes v. City of New York*, 176 F.3d 138 (2d Cir. 1999), the Second Circuit considered an unlawful search of a taxicab in which the plaintiff was a passenger. *Id.* at 141. The search recovered handguns which led to the plaintiff's arrest and a search incident to the arrest discovered cocaine. *Id.* Although the trial court did not suppress the evidence, on appeal, a New York state court held that the initial search was unlawful and the evidence had to be excluded, leading to the dismissal of the plaintiff's indictment and his release. *Id.* at 142. The plaintiff subsequently filed a § 1983 suit, seeking damages not for the invasions of his privacy, "but rather for injuries derivative of these invasions—his arrest, conviction, and incarceration." *Id.* at 141. The *Townes* court held that the plaintiff was entitled only to damages for injuries caused by the violation of his constitutional rights, explaining that neither the "fruit of the

poisonous tree doctrine" nor "traditional common law tort principles of causation" provided a basis for the damages claimed by the plaintiff.  *Id.*

The plaintiff argues that *Townes* is distinguishable, pointing out that the *Townes* court found that the plaintiff in that case could not recover damages for his criminal defense fees and incarceration because the trial court's failure to suppress the evidence was an intervening and superseding cause of those damages.  *See* Pl.'s Supp. Opp'n at 3.  Indeed, in *Townes*, the Second Circuit held that "the trial court's failure to suppress the evidence concerning Townes's own criminal acts constituted a superseding cause of Townes's conviction and imprisonment." *Townes*, 176 F.3d at 146–47.  The plaintiff argues that unlike *Townes*, the D.C. Superior Court in this case suppressed the evidence at the outset, and thus no intervening and superseding cause exists which cuts off the chain of causation from the unlawful search and seizure to the plaintiff's arrest, prosecution, and incarceration.  Pl.'s Supp. Opp'n at 3.[12]

The plaintiff errs by ignoring the alternative holding of the *Townes* court: "the injury [the *Townes* plaintiff] plead[ed] (a violation of his Fourth Amendment right to be free from unreasonable searches and seizures) d[id] not fit the damages he s[ought] (compensation for his conviction and incarceration)."  *Townes*, 176 F.3d at 147.  As the *Townes* court recognized, the Supreme Court's § 1983 jurisprudence has sought to "tailor liability to fit the interests protected by the particular constitutional right in question."  *Id.* at 148 (citing *Carey*, 435 U.S. at 258–59).  "In other words, § 1983 damages should be made available only for risks that are 'constitutionally relevant.'"  *Id.* (citation omitted).  At bottom, "[t]he evil of an unreasonable

---

[12]     The plaintiff suggests that this Court should follow the reasoning of *Train v. City of Albuquerque*, 629 F. Supp. 2d 1243 (D.N.M. 2009), which held that "a plaintiff who establishes liability for deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations," assuming that the constitutional deprivation at issue proximately caused the asserted damages. *Id.* at 1251.  The plaintiff correctly acknowledges, however, that "case law citing to *Train* has developed indicating that the holding in *Train* is not widely accepted across circuits."  Pl.'s Supp. Opp'n. at 3.

search or seizure is that it invades privacy, not that it uncovers crime, which is no evil at all." *Id.* (footnote omitted).

In *Hector v. Watt*, 235 F.3d 154 (3d Cir. 2000), the Third Circuit agreed with the Second Circuit's analysis in *Townes*, reasoning that because the Supreme Court's decision in *Carey v. Piphus* "instructs that we should assess liability in terms of the risks that are constitutionally relevant, then damages for an unlawful search should not extend to post-indictment legal process, for the damages incurred in that process are too unrelated to the Fourth Amendment's privacy concerns." *Id.* at 157. The Third Circuit agreed with the Second Circuit that "[v]ictims of unreasonable searches or seizures may recover damages directly related to the invasion of their privacy—including (where appropriate) damages for physical injury, property damage, injury to reputation, etc.; but such victims cannot be compensated for injuries that result from the discovery of incriminating evidence and consequent criminal prosecution." *Id.* (quoting *Townes*, 176 F.3d at 148).

To be sure, a cause of action for false arrest would allow a plaintiff to "seek damages from the time of detention up until issuance of process or arraignment." *Townes*, 176 F.3d at 149. Similarly, a claim of malicious prosecution would permit damages for "confinement imposed pursuant to legal process." *Id.* (quoting *Heck v. Humphrey*, 512 U.S. 477, 484 (1994)); *see Heck*, 512 U.S. at 488 ("[A] successful malicious prosecution plaintiff may recover, in addition to general damages, 'compensation for any arrest or imprisonment, including damages for discomfort or injury to his health, or loss of time and deprivation of the society." (internal quotation marks and citation omitted)). The plaintiff, however, never brought a claim for false arrest or malicious prosecution, claiming only unlawful search and seizure. Accordingly, he can be compensated only for those damages "directly related to the invasion of [his] privacy."

*Townes*, 176 F.3d at 148; *see also Silver v. D.C. Metro. Police Dep't*, 939 F. Supp. 2d 20, 22–23 (D.D.C. 2013) (concluding a § 1983 plaintiff alleging unlawful search and seizure could not recover for "damages for the mental and emotional injuries he allegedly suffered as a result of his arrest and detention"); *Hampton v. District of Columbia*, 764 F. Supp. 2d 147, 150 (D.D.C. 2011) ("There is no legally cognizable causal relationship [ ] between an officer's search of a plaintiff's belongings and the arrest and detainment that may result from the fruits of that search."). Accordingly, because evidence regarding the plaintiff's arrest, prosecution, and incarceration would not be relevant to the plaintiff's damages, the plaintiff may not present any such argument or evidence.

### 2. The Admissibility of Evidence Regarding the Court's Order Instructing that the Plaintiff's Property Be Returned

In his criminal case, the plaintiff moved to suppress the evidence seized from his apartment, and Judge Ryan granted the plaintiff's motion and ordered that the evidence be returned pursuant to Rule 41(g) of the D.C. Superior Court Rules of Criminal Procedure. *See District of Columbia v. Corrigan*, Case No. 2010-CDC-2483, Order Granting Mot. Return of Property (D.C. Sup. Ct. Apr. 10, 2013). The defendants assert that any evidence or argument regarding this order would be unduly prejudicial, would usurp the role of the jury and the Court, and would confuse the jury. *See* Defs.' Mot *In Limine*, at 9–11, ECF No. 104. The plaintiff argues the evidence of the return of the plaintiff's guns and ammunition is necessary for the jury to assess the plaintiff's damages.

As neither of the defendants were parties to the underlying criminal matter, the evidence regarding the Superior Court's order would be unduly prejudicial and thus may not be admitted. *See* FED. R. EVID. 403. To the extent the return of the guns and ammunition is relevant to the

computation of the plaintiff's damages, the fact that the items were returned may be admitted through stipulation or testimony without reference to the Superior Court's order.

## IV.     CONCLUSION

For the foregoing reasons, at trial, the defendants are precluded from presenting any argument that the EOD search was constitutional and the plaintiff may seek an instruction from the Court that the EOD search was in violation of the plaintiff's Fourth Amendment rights. Evidence regarding the items seized during or directly after the EOD search may be admitted. The plaintiff, for his part, is precluded from presenting evidence or argument regarding his arrest, incarceration, or prosecution, including any reference to the Superior Court's order returning certain seized items.

An appropriate Order accompanies this Memorandum Opinion.

Date: June 8, 2017

_____
BERYL A. HOWELL
Chief Judge